# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00200-CV

**Appellant, Buddy Gregg Motor Homes, Inc.//Cross-Appellant, Liberty Coach, Inc.**

**v.**

**Appellees, Motor Vehicle Board of the Texas Department of Transportation and Liberty Coach, Inc.//Cross-Appellee, Buddy Gregg Motor Homes, Inc.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. GN400161, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

Buddy Gregg Motor Homes, Inc. ("BGMH") and Liberty Coach, Inc. ("Liberty") appeal an order issued by the Motor Vehicle Board of the Texas Department of Transportation ("the Board") concerning the termination of the franchise agreement between the parties. BGMH and Liberty entered into the agreement in the 1990s; BGMH agreed to purchase all of the luxury motor homes Liberty produced for a period of time. Both parties were satisfied with the franchise arrangement for seven years.

Later, when the parties became increasingly dissatisfied with the agreement, the manner in which the parties dealt with one another also deteriorated. Liberty attempted to terminate the agreement but did not comply with the requirements specified in the occupations code for termination of a motor vehicle franchise agreement. Eventually, BGMH demanded that Liberty

repurchase all the unsold motor homes in its inventory as allowed by statute. *See* Tex. Occ. Code Ann. § 2301.465(b) (West 2004). Liberty repurchased the inventory at BGMH's request.

Eventually, BGMH filed a formal complaint with the Board. After hearing evidence from both parties, the Board issued its order, concluding that both parties violated the duty of good faith and fair dealing, that Liberty should be assessed a penalty for failing to fulfill the statutory requirements for termination of a franchise agreement, that BGMH's repurchase demand operated as a de facto termination of the franchise agreement, and that Liberty repurchased BGMH's inventory in a timely manner. Both BGMH and Liberty appeal. *See* Tex. Occ. Code Ann. § 2301.751 (b) (West 2004). We will affirm the order of the Board.

## FACTUAL BACKGROUND

**Statutory Framework**

The Board is a Texas agency that has the statutory authority to regulate franchise relationships between dealers and motor vehicle manufacturers, including manufacturers of motor homes. *See* Tex. Occ. Code Ann. §§ 2301.001-2401.253 (West 2004). Under the occupations code, a franchise is one or more contracts between a motor vehicle manufacturer and a dealer setting out their relationship, including the right of the dealer to sell and service motor vehicles and any duty or obligation granted or imposed by the occupations code. *Id.* § 2301.002(15). One of the primary goals of the provisions of the occupations code[1] is to "ensure a sound system of distributing and

---

[1] During the time period in question, the statutes governing motor vehicle franchises were found in the Texas Motor Vehicle Commission Code. Tex. Rev. Civ. Stat. Ann. art. 4413(36) (West 1976). However, effective June 1, 2003, the Texas Motor Vehicle Commission Code was repealed. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 1421, § 5, 2001 Tex. Gen. Laws 4570, 4920. Although the order and placement of provisions were substantially altered, most of the substance of

selling motor vehicles" in our state. *Id.* § 2301.001. To accomplish this goal, the code authorizes the Board to "(1) administer this chapter [of the occupations code]; . . . (3) ensure that the distribution, sale, and lease of motor vehicles is conducted as required by [the occupations code] and [B]oard rules; . . . and (5) prevent fraud, unfair practices, discrimination, impositions, and other abuses in connection with the distribution and sale of motor vehicles." Tex. Occ. Code Ann. § 2301.152(a); *see also Subaru of Am., Inc. v. David McDavid Nissan*, 84 S.W.3d 212, 224 (Tex. 2002).[2]

Manufacturers and dealers entering into a franchise agreement must obtain a license from the Board in order to conduct business in Texas. Tex. Occ. Code Ann. § 2301.251(a). Once the parties have entered into a franchise agreement, each party owes a duty of good faith and fair dealing to the other party, which is actionable in tort. *Id.* § 2301.478(b).

After a franchise agreement has been entered, certain requirements must be met for a manufacturer to terminate the franchise agreement. *Id*. § 2301.453. First, the manufacturer must give written notice to the Board and to the dealer at least 60 days (or 15 days in certain circumstances) before the proposed termination date that sets out the specific reasons for the termination and contains a conspicuous statement on the first page notifying the dealer of its right to protest the termination and have a hearing before the Board. *Id.* § 2301.453(c), (d).[3] If, after

the commission code provisions was codified into occupations code chapter 2301. For the purposes of this appeal, we will refer to the occupations code unless the occupations code substantially differs from its predecessor.

[2] The *Subaru* decision was decided before the predecessor to the occupations code, the Texas Motor Vehicle Commission Code, was codified. *See* Tex. Rev. Civ. Stat. art. 4413(36).

[3] Section 2301.453 reads, in relevant part, as follows:

receiving the notice, the dealer files a protest with the Board within the required time, the Board shall schedule a hearing in which the manufacturer must demonstrate good cause for the termination by a preponderance of the evidence. *Id.* § 2301.453(e), (g). If the dealer does not file a protest, the franchise agreement will be terminated after notice of termination if (1) the dealer consents in

---

(c) Except as provided by Subsection (d), the manufacturer, distributor, or representative must provide written notice by registered or certified mail to the dealer and the board stating the specific grounds for the termination or discontinuance. The notice must:

    (1) be received not later than the 60th day before the effective date of the termination or discontinuance; and

    (2) contain on its first page a conspicuous statement that reads: "NOTICE TO DEALER: YOU MAY BE ENTITLED TO FILE A PROTEST WITH THE TEXAS MOTOR VEHICLE BOARD IN AUSTIN, TEXAS, AND HAVE A HEARING IN WHICH YOU MAY PROTEST THE PROPOSED TERMINATION OR DISCONTINUANCE OF YOUR FRANCHISE UNDER THE TERMS OF CHAPTER 2301, OCCUPATIONS CODE, IF YOU OPPOSE THIS ACTION."

(d) Notice may be provided not later than the 15th day before the effective date of termination or discontinuance if a licensed dealer fails to conduct its customary sales and service operations during its customary business hours for seven consecutive business days. This subsection does not apply if the failure is caused by:

    (1) an act of God;

    (2) a work stoppage or delay because of a strike or labor dispute;

    (3) an order of the board; or

    (4) another cause beyond the control of the dealer.

Tex. Occ. Code Ann. § 2301.453(c), (d) (West 2004).

4

writing or (2) the time to file a protest has expired. *Id.* § 2301.453(a). In addition, section 2301.455 of the occupations code requires the Board to consider several enumerated factors when determining if a manufacturer has provided good cause for termination of a franchise agreement. *Id.* § 2301.455(a). Further, the code provides that "good cause shall not be shown solely by the desire of a manufacturer . . . for market penetration." *Id.* § 2301.455(b).

Under the occupations code, if a franchise is terminated, the vehicle manufacturer has to repurchase the new motor vehicles with less than 6000 miles in the dealer's inventory for a price determined by a formula in the statute. Tex. Occ. Code Ann. § 2301.465(b). The payment for the new motor vehicles must be made within 60 days of the date of the termination or "at the time the dealer and any lienholder proffer good title before the time required for payment." *Id.* § 2301.465(c), (g). If the manufacturer does not pay on time, it is liable for either the dealer cost, the fair market value, or the current value of the vehicles plus attorney's fees and interest. *Id.* § 2301.465(g). Further, section 2301.805 of the occupations code allows a dealer who suffered damages as a result of a manufacturer's violation of the occupations code to maintain an action under the Deceptive Trade Practices Act ("DTPA"). *Id.* § 2301.805 (West 2004); *see* Tex. Bus. & Com. Code Ann. §§ 17.41-17.63 (West 2002 & Supp. 2004-05).

**Franchise Agreement**

This case concerns the termination of a franchise agreement between Liberty and BGMH. Liberty is an Illinois-based corporation that produces luxury motor homes or coaches. A coach from Liberty can cost anywhere between $900,000 and $1,700,000. Liberty creates these luxury coaches by customizing the interiors of bus shells. Liberty is a family-owned company run

by Frank Konigseder. In addition to its Texas market, Liberty has sold coaches in Florida since 1972, either directly or indirectly through franchise agreements.

BGMH is a Tennessee-based corporation owned by Buddy Gregg that has been in the business of selling and servicing motor homes for more than twenty years. Further, BGMH is a licensed motor vehicle dealer in Texas and has had successful recreational vehicle dealerships in Florida, Tennessee, Oregon, and Texas.

In 1992, Liberty and BGMH entered into a franchise agreement obligating BGMH to buy all the coaches that Liberty produced in exchange for becoming the exclusive dealer for Liberty coaches. However, the agreement allowed Liberty to sell a coach directly to a purchaser provided that Liberty give BGMH a commission from the transaction. In addition, the distribution agreement linked Liberty's production schedule to BGMH's sales so that, during difficult economic times or when the sale of coaches was not corresponding to the production of coaches, Liberty would modify its production schedule to accommodate BGMH. Liberty claims that when BGMH's sales dropped, it either reduced production or took other action to help BGMH on several occasions.

The parties executed a new franchise agreement in 2001 that would automatically renew annually every February 1, unless the agreement was terminated.[4] If either party wanted to terminate, it would have to provide six-months written notice prior to the date of termination.

Both agreements provided that Liberty and BGMH agreed not to own or be employed by a business that would be in competition with the other company's "present business." Additionally, Liberty agreed not to compete with BGMH's selling and servicing of coaches in

---

[4] Under the initial franchise agreement, the renewal date had been October 1.

Tennessee, Florida, Texas, and any state that "abuts" these states. The 2001 agreement amended this provision to allow Liberty to sell or market its coaches in the prohibited states if BGMH failed to purchase 100% of Liberty's production.

**The Deterioration of the Franchise Relationship**

In 1999, BGMH had financial problems. Because of these financial problems, BGMH closed its dealership in Oregon and sold the dealership it had in Texas; BGMH eventually reopened a Texas dealership.

In December 2000, BGMH asked Liberty about the possibility of entering into a new franchise agreement as BGMH was making plans to re-open its Texas dealership. Frank Konigseder, part owner of Liberty, testified that he was hesitant about entering into a new agreement because of rumors that BGMH might close its Florida dealership. Konigseder further testified that when he expressed his concerns, Gregg stated that "he didn't know at the time if he was" closing the Florida dealership or not. Konigseder also testified that the Florida market was important to Liberty because a large number of Liberty's coaches move through Florida and because many wealthy individuals with discretionary income either live in Florida or vacation there. Finally, Konigseder testified that he would not have signed the new franchise agreement if he had not believed BGMH would continue its Florida dealership.

However, BGMH sold the Florida dealership before Liberty signed the new agreement in February 2001. The state of Florida initiated imminent domain proceedings against part of BGMH's property, and BGMH sold the remainder of its Florida dealership to National RV Holdings ("National RV") in January 2001. Under the terms of the sales agreement, BGMH could

have occupied the Florida dealership until the middle of April 2001, but it closed its Florida dealership in February 2001.

BGMH also surrendered its dealer's license to sell motor vehicles in Florida, which prohibited BGMH from engaging in sales and service functions in Florida. Further, Gregg testified that he had no "present business" in Florida when the new agreement was signed because he had already sold the Florida dealership. After learning that BGMH had closed its Florida dealership, Liberty claims that it received numerous complaints from dissatisfied customers about the lack of adequate services. Gregg denied that he had given any assurances to Liberty about maintaining the Florida dealership. On the contrary, Gregg insists that he told Konigseder that he had reached an agreement to sell his Florida dealership to National RV.

Becoming dissatisfied with their agreement, Liberty sent a letter to BGMH on July 30, 2001, stating that the franchise agreement would be terminated on January 31, 2002, unless BGMH agreed to twenty-one modifications to the franchise agreement within 24 hours. The letter did not satisfy the requirements of the occupations code: it did not contain the "notice to dealer" termination language, it was not sent to the Board, and it did not specify the grounds for termination. BGMH characterizes Liberty's letter as an unlawful attempt at termination. This characterization is based on the fact that the predecessor to the occupations code, the motor vehicle commission code, deemed unlawful certain behaviors by a manufacturer or distributor. *See* Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1421, § 5, 2001 Tex. Gen. Laws 4570, 4920. One of the prohibited activities listed as unlawful was terminating a franchise agreement without satisfying all the statutory requirements.

8

Although the letter stated the agreement would be terminated unless amendments were agreed to by July 31, BGMH and Liberty negotiated changes to the franchise agreement after July 31.

Months after BGMH closed its Florida dealership, Liberty obtained a Florida dealer's license. In addition, Liberty incorporated Liberty Coach of Florida, Inc. and attempted to look for locations to establish a sales and service facility. Konigseder testified that having service facilities in Florida was necessary to keep their customers satisfied and prevent them from purchasing coaches from competitors with a service facility in Florida.

BGMH argues that it was unnecessary for Liberty to open a repair and service facility in Florida because, although the 2001 franchise agreement prevented Liberty from competing with BGMH, nothing in the agreement prevented Liberty from contracting with unaffiliated third parties to provide services to Liberty coach owners. Further, Buddy Gregg insists that there is no evidence that BGMH would have been unable to purchase all of the coaches Liberty produced despite the loss of the Florida dealership. Finally, BGMH alleges that surrendering its license did not permanently preclude it from operating in Florida and that it could have obtained another license if necessary.

Although Liberty had obtained a dealer's license in Florida, Konigseder testified that Liberty began discussions with BGMH to open another dealership in Florida as a joint venture between the two parties. However, the joint venture never materialized.

Instead, Liberty opened its Florida service and sales facility in October 2001. Even though BGMH had surrendered its dealer's license in Florida, had sold its Florida dealership, and subsequently admitted that it had no "present business" in Florida after closing its dealership, Gregg

9

testified that Liberty was prohibited by contract from opening a sales and service facility in Florida because the contract prohibits Liberty from opening a competing facility. After Liberty opened its service and sales facility in Florida, BGMH sent a letter to Liberty, stating that revisions to the agreement between the parties needed to be finalized and that, if Liberty believed the agreement had been terminated, BGMH reserved all rights under federal and state law and the rights expressed in the agreement for breach of contract.

After opening the sales and service facility, Liberty sent coaches numbered 512 and 515 to its Florida facility. Liberty also sent a letter to BGMH's attorney stating that BGMH owed Liberty $133,414.19 for prior service work and other items and that payment had been requested on several occasions. The letter further stated that until payment was received, "no payments or deliveries on any new coaches" would be forthcoming and "no further negotiations regarding the Exclusive Distribution will take place."

Two days after receiving the demand letter, BGMH sent a check in the amount of $104,284.29 to Liberty's attorney. BGMH also tendered a check in the amount of $29,129.90 but instructed Liberty's attorney to hold the check in trust and release it to Liberty only after BGMH had a chance to review its records to determine whether it owed this additional amount of money.

After BGMH sent the two checks to Liberty's attorney, Liberty wrote a letter in November asking for payment for coaches 512, 515, and 516, which Liberty stated either had been or were now invoiced and ready to deliver. Although Liberty sent invoices for coaches 512 , 515, and 516, Liberty did not send certificates of origin for coaches 512 and 515. An employee of BGMH

10

testified that the certificates and invoices were necessary prerequisites for financing the purchase of the coaches.

Although BGMH had not received the certificates for coaches 512 and 515, it had all documents necessary for obtaining financing on coach 516. After obtaining a customer for coach 516, BGMH asked Liberty to deliver the coach in December 2001. However, Liberty did not deliver the coach and conditioned delivery of the coach on payment for all three of the coaches. BGMH did not purchase all three coaches, and the sale of coach 516 never finalized.

After BGMH's request for delivery, Liberty's counsel sent a letter on December 10, 2001, to BGMH asking for the release of the $29,129.90 check and again asking for payment for coaches 512 and 515. Further, the letter communicated to BGMH that if Liberty did not receive payment for the coaches by December 12, 2001, two days after the letter was sent, then Liberty would assume that BGMH was either unwilling or unable, under the terms of the exclusive distribution agreement, to take delivery of the coaches.

On December 12, 2001, Liberty's requested payment deadline for coaches 512 and 515, BGMH filed suit against Liberty in Knox County, Tennessee, seeking a declaration of the rights and obligations of the parties under the franchise agreement and seeking money damages. In addition, BGMH asked the court to enjoin Liberty from doing any further business in Florida through its dealership and to declare that BGMH had no further obligation to purchase any coaches from Liberty, including coaches 512 and 515. The day after suit was filed, Liberty's counsel sent a letter to BGMH stating that it had received a copy of the lawsuit in Tennessee; that, as a result of BGMH's

11

alleged violations of the exclusive distribution agreement, coach 516 would be the last coach that Liberty would give to BGMH; and that Liberty would not accept payment for any new coaches.

BGMH's attorney replied to Liberty on December 21, 2001, demanding that Liberty immediately purchase the eight coaches BGMH had in its inventory for $7,010,439.00 or else legal action for damages, including punitive damages, might be taken. Both the franchise agreement and the occupations code required Liberty to repurchase new coaches remaining in BGMH's inventory if the agreement was terminated. *See* Tex. Occ. Code Ann. § 2301.465(b). Specifically, section 2301.465 requires that a manufacturer repurchase the new motor vehicles in the dealer's inventory that have mileages of 6000 miles or less after the termination of a franchise agreement. *Id.*

The occupations code specifies that the repurchase must be made within sixty days of the date of termination or "at such earlier time as the dealer and any lienholder proffer to the manufacturer good title to the vehicles." *Id.* § 2301.465(c), (g). BGMH's letter stated that it was proffering good title on its own behalf and on behalf of the alleged lienholder, Volvo Commercial Finance L.L.C. The Americas ("Volvo,") but did not include any title documents.

Liberty responded that it would not comply with BGMH's demand because the case was pending before a court in Tennessee and all obligations of the parties would be decided before that court.

Shortly after filing suit in Tennessee, BGMH's counsel sent a letter to the Board stating that Liberty had violated several provisions of the occupations code and had refused to purchase the remaining coaches in BGMH's inventory. After receiving the letter, the head of the enforcement division of the Board wrote a letter to Liberty on January 8, 2002, that both informed

12

Liberty of BGMH's complaints and encouraged Liberty to settle the matter in good faith or risk the Board becoming involved in the matter.

After filing its complaint with the Board in late December 2001, BGMH filed suit against Liberty in Denton County, Texas, in January 2002. BGMH sought damages under the occupations code for Liberty's alleged failure to repurchase the coaches from BGMH's inventory and for Liberty's alleged unlawful termination of the franchise.

However, Liberty claims that, on several occasions, it tried to notify BGMH that it was ready to purchase the inventory, but BGMH did not respond. Ultimately, Liberty purchased the coaches for the amount demanded on January 23, 2002, which was thirty three days after BGMH had sent the demand letter. After Liberty repurchased the inventory, the Board's director of enforcement closed her file on the dispute.

Several months after the Board had closed its files, BGMH filed a formal complaint to the Board after the supreme court issued its *Subaru* opinion, specifying the Board's role in franchise agreement disputes. 84 S.W.3d 212. In *Subaru*, the supreme court determined that a party may not pursue a claim in court without the Board first resolving issues and claims arising under the occupations code. *Id.* at 223. After the Board's decision regarding alleged violations is final, a trial court may adjudicate the damages arising from those claims. *Id.* at 224-25. After BGMH filed its formal complaint, the suit in Denton County was stayed to allow the Board the opportunity to make findings and issue a decision.

BGMH's complaint to the Board alleged that Liberty unlawfully terminated or refused to continue in the franchise agreement without satisfying all the conditions required for termination,

13

that Liberty did not have good cause to terminate the agreement, and that Liberty did not timely repurchase the vehicles from BGMH's inventory. In addition, BGMH sought findings of fact and conclusions of law from the Board that were consistent with its allegations.

In response, Liberty denied that it had violated Texas law and generally denied the allegations in BGMH's petition. Further, Liberty alleged BGMH failed to invoke the Board's jurisdiction in a timely manner because BGMH failed to act quickly enough after receiving the July 2001 notice of termination or, alternatively, failed to protest the termination.

**The Board's Decision**

The administrative law judge ("ALJ") issued his proposal for decision after hearing evidence, receiving a jointly stipulated chronology of events, and obtaining written closing arguments. In the opinion, the ALJ concluded that, because conditions for termination in the 2003 statute were not met, Liberty's attempts to terminate the franchise agreement were futile, and, therefore, the franchise agreement was still in effect. The opinion does not include a finding that Liberty's attempts to terminate the agreement were unlawful. The ALJ also reasoned that a manufacturer cannot be compelled to repurchase inventory until after a franchise agreement has been terminated. Thus, even though the ALJ had determined that Liberty's actions had not terminated the agreement, he concluded that Buddy Gregg itself had terminated the agreement with its repurchase demand.

The ALJ also concluded Gregg had already sold the Florida dealership when he told Konigseder that he had not yet decided whether he would sell. The ALJ further concluded that the Florida market was "critical" for Liberty, that "[BGMH] knew or—based on [the decade-long

business relationship between BGMH and Liberty] reasonably should have known—that the Florida market was very important to Liberty," and that "Mr. Gregg also knew—or considered it likely enough to warrant deception—that Liberty would not sign the new franchise in the face of [BGMH's] withdrawal from Florida."

The proposal for decision also described Liberty's changes in its long-time course of dealing with BGMH. The ALJ noted that, rather than providing invoices to BGMH for coaches 512 and 515, Liberty sent the coaches to its Florida facility. In addition, the ALJ noted that Liberty's sending of a letter demanding payment for prior service work and other items was a real change in the course of dealing between BGMH and Liberty because, formerly, BGMH and Liberty settled accounts once a year.

In the proposal, the ALJ made the following conclusions: (1) the Board had jurisdiction over the controversy; (2) Liberty's behavior after BGMH withdrew from Florida, especially the treatment of coaches 512, 515, and 516, violated the statutorily imposed duty of good faith and fair dealing; (3) Gregg misled Konigseder about his decision to withdraw from Florida in order to overcome Konigseder's hesitation about entering into the 2001 franchise agreement; (4) both parties stand *in pari delicto*, or in equal fault, concerning the bad faith claim, and, therefore, no civil penalty should be imposed; (5) Liberty should be assessed a fine of $1,000 for failing to comply with the requirements for terminating a franchise agreement when it sent its July 2001 notice of termination; and (6) Liberty repurchased BGMH's inventory within the period allowed by statute. *See* Tex. Occ. Code Ann. §§ 2301.453(c) (specifying termination requirements), .465 (requiring

15

manufacturer to repurchase inventory), .478(b) (imposing duty of good faith and fair dealing), .801 (allowing for imposition of civil penalty).

In addition to the conclusions of law, the proposal also contained 36 findings of fact, including the following:

15. During the negotiations for the 2001 franchise agreement, Mr. Gregg stated to Frank X. Konigseder of Liberty Coach that he (Mr. Gregg) did not know if he (Mr. Gregg) was going to withdraw from the Florida market.

16. At the time Mr. Gregg made that statement to Mr. Konigseder, Mr. Gregg knew that his Florida dealership had been sold on January 24, 2001.

. . .

18. By February 28, 2001, BGMH had ceased doing business in Florida and surrendered its Florida dealer's license for cancellation.

19. On March 15, 2001, the state of Florida canceled the dealer's license of BGMH.

20. On or after March 15, 2001, BGMH was not in the business of selling and servicing motor homes in the state of Florida.

. . .

25. When BGMH withdrew from the Florida market in March 2001, the non-competition provision of the 2001 franchise agreement was vacated as to the state of Florida.

. . .

28. Even though the non-competition provision had been vacated as to the state of Florida, Liberty remained obligated to deliver coaches to BGMH as required by the terms of the 2001 franchise agreement.

29. In November 2001, Liberty delivered coaches 512 and 515 directly into the inventory of its Florida dealership.

30. On December 4, 2001, Liberty refused to deliver coach 516 to BGMH unless BGMH also paid for coaches 512 and 515.

31. On December 13, 2001, Liberty notified BGMH that it would deliver no more coaches to BGMH.

32. BGMH filed no formal complaint with the Motor Vehicle Board, but instead on December 21, 2001 demanded that Liberty repurchase the eight Liberty coaches that BGMH held in inventory.

After the ALJ issued his proposal for decision, the Board issued its final order in September 2003, adopting all of the findings of fact, conclusions of law, and recommendations of the ALJ. After the Board issued its final order, both Liberty and BGMH appealed the decision of the Board to the district court. *See id.* § 2301.751(a) (West 2004) (allowing party to seek judicial review of Board's final order in district court under substantial-evidence rule). Liberty filed a motion to consolidate the appeals, with which the Board agreed. However, BGMH removed its appeal to this Court. *See id.* § 2301.751(b) (allowing removal of appeal of final order of Board in district court to court of appeals prior to trial in district court). Liberty agreed to remove its appeal to this Court, and both Liberty and the Board filed a joint motion to consolidate the appeals, which was granted.

**STANDARD OF REVIEW**

This case involves an appeal from a final order issued by the Board. *See id.* § 2301.751(a) (affected party may seek judicial review under substantial-evidence review standard); Tex. Gov't Code Ann. §§ 2001.171 (person who has exhausted all administrative remedies is entitled to judicial review), .174 (West 2000) (describing judicial review under substantial-evidence review).

17

The Board has exclusive jurisdiction over claims brought by dealers alleging violations of the occupations code. *See Subaru*, 84 S.W.3d at 223 (describing jurisdiction under predecessor to occupations code). When considering the relationship between the Board's jurisdiction and a court's jurisdiction over code violations, the supreme court concluded that the Board must resolve claims based on code violations before a party proceeds in court, that the predecessor to the occupations code created a "hybrid claims resolution process" for parties seeking damages for code violations, and that "a party must exhaust administrative remedies to obtain a Board decision about Code violations, if any, to support a DTPA or bad-faith claim based on Code violations." *Id.* at 224; *see also* Tex. Occ. Code Ann. §§ 2301.478, .805 (West 2004). The Board does not have the power to award damages to remedy a harm caused by a violation of the occupations code, and an aggrieved dealer may file a suit for DTPA-style damages, described in section 2301.805 of the occupations code, only after the Board issues a decision regarding the alleged code violations. *Subaru*, 84 S.W.3d at 223; *see also* Tex. Occ. Code Ann. § 2301.805.

The Board's decision regarding alleged violations of the motor vehicle code is reviewed under a substantial-evidence standard. Tex. Occ. Code Ann. § 2301.751(a); *see* Tex. Gov't Code Ann. § 2001.174. In a substantial-evidence review, we may not substitute our judgment for that of the agency on matters committed to agency discretion. Tex. Gov't Code Ann. § 2001.174; *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied). The agency is the sole judge of the weight of the evidence and the credibility of the witnesses. *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex.

App.—Austin 2000, pet. denied). When the agency weighs the evidence, it can accept or reject witness testimony and may accept some of the testimony and disregard the rest. *Id.*

Under a substantial-evidence review, we presume that the Board's order is supported by substantial evidence, and the appellant has the burden of overcoming this presumption. *Graff Chevrolet Co., Inc. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied). The administrative procedure act gives reviewing courts the authority to "test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Id.*; *see* Tex. Gov't Code Ann. § 2001.174(2)(E). Even if the record evidence preponderates against the agency's decision, the evidence may still be enough to satisfy a substantial-evidence review. *Graff*, 60 S.W.3d at 159. However, the agency may not act arbitrarily and without regard to the facts. *H.G. Sledge*, 36 S.W.3d at 602.

A substantial-evidence review does not require us to conclude the agency reached the correct conclusion; rather, substantial-evidence review is satisfied if "some reasonable basis exists in the record for the agency's action." *Graff*, 60 S.W.3d at 159. An agency's actions will be upheld if "the agency's action is such that reasonable minds could have reached the conclusion the agency must have reached in order to justify its action." *Id.* We review findings of fact to determine if they are supported by substantial evidence and review conclusions of law for errors of law. *H.G. Sledge,* 36 S.W.3d at 602. When an administrative agency is charged with a statute's enforcement and also construes the statute, the agency's construction of the statute is entitled to serious consideration as

19

long as the construction is reasonable and does not contradict the plain meaning of the statute. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).

**DISCUSSION**

On appeal, BGMH asserts the Board made the following errors: (1) it failed to enter certain findings of fact and conclusions of law favorable to BGMH; (2) it failed to conclude that Liberty's termination of the franchise agreement was unlawful; (3) it failed to conclude Liberty lacked good cause to terminate the franchise; (4) it failed to find that Liberty did not repurchase the coaches in BGMH's inventory in a timely manner; (5) it failed to find Liberty liable for damages for failing to repurchase the inventory in a timely manner; and (6) it incorrectly concluded that BGMH stood in equal fault with Liberty. In a motion to dismiss, BGMH also contends Liberty's cross-appeal must be dismissed because this Court lacks jurisdiction over Liberty's cross-appeal and because Liberty lacks the capacity to perfect the appeal as a foreign corporation. Because they are related, we will combine BGMH's fourth and fifth issues. In addition, because we conclude that BGMH, not Liberty, terminated the agreement, we need not address whether Liberty had good cause to terminate the agreement. Otherwise, we will address BGMH's issues in the order provided.

Liberty raises the following issues in its cross-appeal: (1) BGMH's complaint to the Board was untimely; (2) Liberty was not required to include the statutorily prescribed language in its notice of termination; (3) the Board's conclusion that Liberty engaged in bad faith is not supported by substantial evidence; (4) Liberty did not violate any provisions of the occupations code because BGMH induced Liberty to enter the 2001 franchise agreement, which nullified the

20

agreement; and (5) the Board exceeded its authority because it adjudicated the parties' rights under a national franchise agreement in a manner that went beyond the boundaries of Texas.

After addressing BGMH's issues on appeal, we will address Liberty's issues in the order presented.

**No Additional Findings of Fact or Conclusions of Law Need to be Entered: the Board's Order was Proper**

In its first issue on appeal, BGMH contends that the Board erred by failing to enter certain required findings of fact and conclusions of law favorable to BGMH.[5] Because this case was removed from the district court, BGMH asserts that this Court, as an appellate court, has the power to modify the Board's final order to include the requested findings of fact and conclusions of law. However, under the occupations code, the Board has broad and exclusive jurisdiction to regulate the distribution, sale, or lease of motor vehicles. *See* Tex. Occ. Code Ann. §§ 2301.001, .151.[6] A court

---

[5] Specifically, BGMH asserts that the Board should have made the following findings of fact: (1) Liberty terminated or refused to continue its franchise with BGMH without meeting all the statutory requirements; (2) Liberty lacked good cause to terminate or refuse to continue BGMH's franchise; (3) Liberty failed to timely repurchase the coaches in BGMH's inventory as required after BGMH proffered good title; and (4) BGMH did not have unclean hands and had no fault in its dealings with Liberty regarding coaches 512, 515, and 516. In addition, BGMH asserts that the Board should have adopted the following conclusions of law: (1) Liberty's termination of BGMH's franchise was unlawful; (2) Liberty lacked good cause to terminate BGMH's franchise; (3) Liberty is liable to BGMH for an amount equal to the greater of the dealer costs, fair market value, or the then current price of the Liberty motor homes in its inventory that had no more than 6000 miles after being delivered to BGMH; and (4) BGMH and Liberty did not have equal fault regarding the handling of coaches 512, 515, and 516.

[6] Section 2301.001 of the occupations code reads, in relevant part, as follows:

The distribution and sale of motor vehicles in this state vitally affects the general economy of the state and the public interest and welfare of its citizens. This chapter shall be liberally construed to accomplish its purposes, including the

21

"cannot modify an agency order without usurping the agency's authority and thereby violating the separation of powers doctrine." *City of Stephenville v. Texas Parks & Wildlife Dep't*, 940 S.W.2d 667, 678 (Tex. App.—Austin 1996, writ denied). Accordingly, we may not modify the Board's final order to incorporate the findings of fact and conclusions of law BGMH asserts should have been included in the order originally.

Further, many of the findings and conclusions requested by BGMH were considered by the Board but rejected. The Board concluded that BGMH, not Liberty, terminated the agreement, that Liberty repurchased the inventory in BGMH's possession in a timely manner, and that Liberty and BGMH were both at fault regarding the handling of coaches 512, 515, and 516. When reviewing

---

exercise of the state's police power to ensure a sound system of distributing and selling motor vehicles through:

(1) licensing and regulating manufacturers, distributors, converters, and dealers of vehicles; and

(2) enforcing this chapter as to other persons to provide for compliance with manufacturer's warranties and to prevent fraud, unfair practices, discrimination, impositions, or other abuse of the people of this state.

Tex. Occ. Code Ann. § 2301.001 (West 2004).

Section 2301.151 of the occupation code reads, in relevant part, as follows:

(a) The board has the exclusive original jurisdiction to regulate those aspects of the distribution, sale, or lease of motor vehicles that are governed by this chapter, including the original jurisdiction to determine its own jurisdiction.

(b) The board may take any action that is specifically designated or implied under this chapter or that is necessary or convenient to the exercise of the power and jurisdiction granted under Subsection (a).

*Id.* § 2301.151 (West 2004).

22

determinations of the Board that are committed to the Board's discretion, we do not substitute our judgment for that of the Board. Tex. Gov't Code Ann. § 2001.174; *H.G. Sledge,* 36 S.W.3d at 602. Rather, we only review the Board's findings and conclusions to determine if they are reasonably supported by substantial evidence. *Graff Chevrolet*, 60 S.W.3d at 159; Tex. Gov't Code Ann. § 2001.174(2)(E). As discussed later in the opinion, these determinations are supported by substantial evidence.

In addition to its previous arguments, BGMH asserts that the narrative portion of the Board's final order was improper because it addressed topics beyond the controlling Code-based issues the Board has jurisdiction over. BGMH avers that the findings of fact and conclusions of law should relate only to the controlling issues rather than addressing evidentiary issues not raised by the pleadings. *See Rafferty v. Finstad*, 903 S.W.2d 374, 376 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (trial court required by statute to make additional findings and conclusions only if relate to controlling issues). Further, BGMH insists the narrative was essentially an opinion, which BGMH alleges the Board is not authorized to issue. Similarly, BGMH urges that if an ALJ or the Board releases what amounts to an opinion, the opinion should not be reviewed by appellate courts and has no persuasive value.

We disagree with BGMH's characterization of the Board's order. The cases that BGMH cites for the proposition that an opinion issued by the Board or an ALJ has no persuasive value are distinguishable. In *Cherokee Water Co.*, the supreme court characterized statements contained in a letter written by the trial judge and given to the parties prior to the judgment being entered and prior to the findings of fact being released as "not competent evidence of the trial court's

23

judgment." *Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990). The supreme court further concluded that statements in the letter did not qualify as findings of fact. *Id.* In *Kenedy Memorial*, the trial court issued an opinion after a jury trial, and this Court noted that it is generally improper for a trial court to issue its own findings of fact and conclusions of law after a jury trial. *John G. & Stella Kenedy Mem'l Found. v. Dewhurst*, 994 S.W.2d 285, 308 (Tex. App.—Austin, 1999), *rev'd on other grounds*, 90 S.W.3d 268 (Tex. 2002). This Court also stated that the findings issued by the court were not binding and had no persuasive value. *Id.*

Neither of these situations occurred in this case. The findings and conclusions were released at the same time as and formed part of the order. In this case, the Board adopted the proposal for decision issued by the ALJ after a bench trial, and the proposal for decision contained all the statutory requirements for a Board order including the reasons for the actions taken. After a case is submitted, an administrative law judge must prepare, certify, and file the following: (1) findings of fact, (2) conclusions of law, and (3) a recommended decision and order. *See* 16 Tex. Admin. Code § 101.59 (2005). The occupations code lists the requirements that must be present in an order issued by the Board. Specifically, section 2301.711 requires the Board to include the following items in one of its orders:

    (a)  An order or decision of the [B]oard must:

        (1)  include a separate finding of fact with respect to each specific issue the board is required by law to consider in reaching a decision;

        (2)  set forth additional findings of fact and conclusions of law on which the order or decision is based; and

        (3)  give the reasons for the particular action taken.

24

Tex. Occ. Code Ann. § 2301.711(a).

In its order, the Board stated that it "duly considered the Proposal for Decision of the Administrative Law Judge, including the findings of fact, conclusions of law, and recommendations contained therein" and stated that the Board adopted the proposal for decision in its entirety, including "the Findings of Fact, Conclusions of Law and recommendations of the Administrative Law Judge."

The narrative portion of the order, which described the history of the parties, the deterioration of the franchise agreement, and the causes of the termination, specified the reasoning for the actions taken by the Board. *See Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc.,* 997 S.W.2d 298, 310-12 (Tex. App.—Austin 1999, pet. denied) (no error for good cause determination to be found in conclusion section of proposal for decision rather than findings of fact or conclusions of law; court concluded proposal still performed useful function of informing parties and courts about Board's determinations and reasons for them). There is no specified manner in which an agency must issue its order, and including findings, conclusions, and reasons for actions within an opinion section of an order is not agency error. *See Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex. 1990) (courts will not subject agencies to "hypertechnical standard of review").

Accordingly, we hold that the Board did not err by failing to enter findings of fact and conclusions of law favorable to BGMH nor by issuing an opinion in addition to findings of fact and conclusions of law. Therefore, we overrule BGMH's first issue on appeal.

25

**BGMH terminated the franchise agreement**

In its second issue on appeal, BGMH contends that the Board incorrectly determined that BGMH terminated the agreement. BGMH insists that Liberty terminated the agreement with its December 13 letter stating that it would no longer provide BGMH with coaches. Alternatively, BGMH asserts that the franchise agreement was terminated by Liberty on January 31, 2002, the termination date Liberty specified in its letter of July 30, 2001. In either case, BGMH asserts that the termination was unlawful because the statutory requirements for a termination were not met: Liberty did not send a written notice, by certified or registered mail, to BGMH or the Board containing specific grounds constituting good cause and containing the required "notice to dealer" termination language.[7] *See* Tex. Occ. Code Ann. § 2301.453.

BGMH asserts that, after realizing Liberty had allegedly terminated the agreement on December 13, it invoked its post-termination right to demand that Liberty repurchase BGMH's inventory to avoid being left with inventory it could not sell or service because the franchise was no longer in existence. Because the termination was allegedly unlawful, BGMH insists that it is entitled to a conclusion specifying that Liberty's action was unlawful and to damages resulting from this unlawful act.

---

[7] As proof of the assertion that a non-renewal letter not containing the conspicuous statutory language and not submitted to the Board is an unlawful termination, BGMH cites to two cases in which manufacturers did not repurchase the inventory from dealers after a termination agreement, and the courts stated the actions were unlawful as specified in the motor vehicle commission code. *See Sportcoach Corp. of Am., Inc. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 734 (Tex. App.—Austin 2000, no pet.); *Kawasaki Motors Corp. USA v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 797 (Tex. App.—Austin 1993, no writ.).

The Board's position is that, under both the motor vehicle commission code and the occupations code, a termination that does not comply with the requirements listed is an ineffective termination. Similarly, the Board argues that the word "unlawful," as it appears in the motor vehicle commission code, means merely "ineffective."[8]

The Board concluded in its order that neither the July 30 letter stating that Liberty was terminating the franchise agreement, nor its December 13 letter stating that Liberty would deliver no more coaches, terminated the franchise agreement. The letters did not include the termination language required by statute. In addition, the July 30 letter left open the possibility of negotiations by setting out certain conditions under which Liberty would be willing to continue. And negotiations between the two parties did occur. Rather than *unlawful* attempts, the Board insists Liberty's actions were *ineffective* termination attempts.

BGMH insists that the termination of the franchise agreement was involuntary and unwanted by BGMH. However, the Board concluded that neither party was without fault in this deteriorating business relationship and neither party wanted to continue the franchise relationship. Much of the evidence indicates that BGMH played a substantial role in ending the franchise agreement. *Cf. Kawasaki Motors Corp. USA v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 796 (Tex. App.—Austin 1993, no writ.) (court approved Commission's finding of de facto termination of manufacturer based on "totality of manufacturer's actions").

---

[8] BGMH insists that if the legislature had intended "unlawful" to mean "ineffective," then it would have amended section 5.02 of the motor vehicle commission code to reflect that intention. However, in the subsequent codified version of the statute appearing in the occupations code, the word "unlawful" was removed from the portion of the statute requiring a termination notice be given to the Board and contain the specific notice to dealer language. Tex. Occ. Code Ann. § 2301.453(c).

First, BGMH sued Liberty in Tennessee in December 2001, asking the court to declare that it had no obligation to purchase any more Liberty coaches. Second, BGMH could have filed a protest with the Board to prevent Liberty from terminating the franchise until the Board determined if Liberty had good cause to terminate, but BGMH chose not to take this action.[9] *See* Tex. Occ. Code Ann. § 2301.453(e), (f). Rather, BGMH sent a letter directly to Liberty invoking a post-termination remedy and demanding Liberty repurchase its inventory. In characterizing the actions of BGMH, the Board explained:

> [BGMH] had been confronted with a series of termination efforts by Liberty that wholly failed to comply with the law governing motor vehicle franchise agreements.

---

[9] Section 2301.453 allows a franchise dealer to protest the termination of a franchise agreement and reads, in relevant part, as follows:

  (e) A franchised dealer may file a protest with the board of the termination or discontinuance not later than the latter of:

    (1) the 60th day after the date of the receipt of the notice of termination or discontinuance; or

    (2) the time specified in the notice.

  (f) After a timely protest is filed under Subsection (e), the board shall notify the party seeking termination or discontinuance that:

    (1) a timely protest has been filed;

    (2) a hearing is required under this chapter; and

    (3) the party may not terminate or discontinue the franchise until the board issues its final order or decision.

Tex. Occ. Code Ann. § 2301.453(e), (f).

> At any time, [BGMH] could have filed a formal complaint with the Board and secured Liberty's continued performance of the agreement. But [it] did not.
>
> Instead, on December 21, 2001 [BGMH] demanded that Liberty repurchase [its] inventory.
>
> The repurchase demand was delivered through [BGMH's] law firm on December 21, in a muscular letter that accused Liberty of violating their agreement. [BGMH's] letter contains nothing—in either language or tone—that suggests [BGMH] is in any way reluctant to be relieved of the eight motor coaches. To the contrary, the letter is persuasive evidence that the repurchase demand was clearly voluntary.

(Footnotes omitted.)

Further, the Board characterized the relationship between BGMH and Liberty in the following manner:

> Liberty's efforts to terminate the franchise had been—for purposes of the Code—futile. Accordingly, the agreement remained in full force and effect. A manufacturer, however, can be compelled to repurchase inventory only after a franchise has been terminated. In other words, a mandatory repurchase cannot occur without a termination. And since Liberty, as a matter of law, had not terminated the franchise, it was left to [BGMH] to satisfy the condition precedent to Liberty's mandatory repurchase obligation.
>
> Accordingly, it was [BGMH's] December 21 demand that Liberty repurchase his inventory that—for purposes of the Code—effectively terminated the franchise agreement. In other words, the dealer in this case, not the manufacturer, terminated the franchise.

In addition, the Board's constructions of the termination provisions of the occupations code and the motor vehicle code, in which the Board concluded that termination attempts that do not satisfy all the statutory requirements are merely ineffective, are reasonable and do not contradict the plain meaning of either statute. Accordingly, the Board's construction is entitled to serious

consideration. *Moore*, 845 S.W.2d at 823. Liberty's actions did not effectively terminate the franchise agreement, either lawfully or unlawfully.[10] Therefore, we uphold the Board's conclusion that BGMH terminated the agreement and overrule BGMH's second issue on appeal.[11]

**Liberty timely repurchased the inventory from BGMH**

In its fourth and fifth issues on appeal, BGMH asserts that Liberty did not repurchase the inventory in a timely manner and that it is entitled to damages. Section 2301.465(c) of the occupations code requires that a manufacturer repurchase, at dealer cost, all the dealer's inventory that has 6,000 miles or less within 60 days after the termination date of a franchise agreement or at the time the dealer and any lienholder proffer good title "before the time required for payment." Tex.

---

[10] We do not agree with BGMH's characterization of the actions of the Board as forcing dealers who receive an ineffective termination notice to either (1) seek post-termination remedies or (2) to treat the franchise agreement as in force and sue the manufacturer for each breach. A dealer could file a protest of termination with the Board. Nor do we agree with BGMH's assertion that the Board's interpretation of Liberty's non-renewal letter as an ineffective termination notice will prevent all DTPA-type actions against manufacturers for unlawful acts. There is no indication that dealers in a franchise agreement will be unable to sue manufacturers for violations of the occupations code. *See*, *e.g.*, Tex. Occ. Code Ann. § 2301.465 (West 2004) (holding manufacturer liable for damages if it does not repurchase dealer's inventory after franchise agreement terminated).

[11] BGMH further asserts that any specific grounds Liberty could have given for terminating the agreement would not have amounted to good cause. BGMH insists that the sole reason for termination that Liberty's president testified to—the desire for market penetration—does not, by definition, constitute good cause to terminate a franchise agreement under the motor vehicle code. *See* Tex. Occ. Code Ann. § 2301.455(b) (West 2004). At the administrative hearing, when Konigseder was asked whether Liberty desired to terminate the franchise agreement because of a desire for market penetration in Florida, he stated that they wanted their customers to have service and the ability to buy a coach in Florida. Eventually, Konigseder admitted that Liberty desired to terminate the agreement because of a desire for market penetration.

However, because we have concluded that there is substantial evidence to support the Board's conclusion that BGMH terminated the franchise agreement, we need not address Liberty's third issue claiming Liberty did not have good cause to terminate the agreement.

30

Occ. Code Ann. § 2301.465(b), (c). If a manufacturer does not pay the dealer within the time required, then the manufacturer is liable for the following:

(1)  the dealer cost, fair market value, or current price of the inventory, whichever amount is highest;

(2)  interest on the amount due . . . ; and

(3)  reasonable attorney's fees and costs.

*Id.* § 2301.465(g).

When the legislature enacts a statute, it is presumed the legislature intended a just and fair result. Tex. Gov't Code Ann. § 311.021(3) (West 2005). In construing a statute, courts should consider both the objects the statute was implemented to attain and the consequences of a particular result. *Id*. § 311.023(1), (5) (West 2005); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (even when statute unambiguous, may consider other factors, including objects to be attained and consequences, when determining legislative intent). A statute should not be construed in a way that leads to absurd conclusions when there is a more reasonable interpretation. *Villareal v. San Antonio Truck & Equip.*, 994 S.W.2d 628, 632 (Tex. 1999). Statutes that impose penalties are strictly construed, and a person who seeks to recover a penalty under the statute must bring himself within the terms of the statute. *See Brown v. De La Cruz*, 156 S.W.3d 560, 564 (Tex. 2004).

BGMH asserts that it (the dealer) and the lienholder proffered good title to the inventory on December 21, 2001, in the following letter sent to Liberty:

[D]emand is hereby made that Liberty Coach repurchase immediately from BGMH Motor Homes, Inc. at its cost the new untitled coaches located in Lewisville, Texas,

31

described in the attached chart. The total repurchase price is $7,010,439.00. BGMH Motor Homes, on its own behalf and on behalf of the lienholder, Volvo Commercial Finance L.L.C. The Americas, hereby proffers good title to such vehicles.

After receiving the alleged proffer of good title, Liberty declined to repurchase the inventory and, in a reply letter, stated that any obligations between the parties would be resolved in the Tennessee lawsuit filed by BGMH. However, Liberty did repurchase the inventory on January 23, 2002, for the amount requested, after BGMH filed suit against Liberty in Denton County alleging, among other things, that Liberty had refused to repurchase the inventory after proffer of good title.

BGMH asserts that the repurchase was untimely because BGMH proffered good title to the coaches and, therefore, Liberty did not have 60 days to repurchase the inventory. BGMH urges that proffering good title means to "offer to deliver the appropriate title documents upon payment, not to unilaterally relinquish the title documents in advance of receiving payment for the vehicles." Because Liberty did not immediately repurchase the inventory when BGMH allegedly proffered good title to the inventory or shortly afterwards, BGMH insists the repurchase was untimely. As a result, BGMH asserts that it is entitled to a finding of fact and conclusion of law that Liberty is liable to BGMH for the greater of the statutory remedies listed in section 2301.465(g) of the occupations code: dealer cost, fair market value, or the current price of the inventory. *See* Tex. Occ. Code Ann. § 2301.465(g).

However, the Board concluded that Liberty repurchased all the inventory in a timely fashion. Liberty repurchased the inventory within 33 days after receiving the request, which is within the 60 day time period that was triggered by BGMH's December 21 termination of the

franchise, for the full amount requested. Further, Liberty claims that, by purchasing all the coaches, it went beyond what was required by statute or by the franchise agreement, to the benefit of BGMH. Two of the coaches were delivered to Liberty with over 6,000 miles even though the occupations code requires repurchase only for vehicles with less than 6,000 miles.[12] *See id.* § 2301.465(b)(1).

In addition, the letter containing BGMH's alleged proffer of good title did not contain, nor were there any documents attached that contained, language or evidence that BGMH had the authority to act on behalf of the alleged lienholder or that Volvo was in fact the lienholder. Rather, the letter states that the author and his firm represent BGMH, not Volvo. Furthermore, no title documents were attached to the letter. On the contrary, the letter states that BGMH would deliver the title documents only after receiving a payment of $7,010,439 from Liberty.

The statement "[BGMH,] on its own behalf and on behalf of the lienholder, Volvo . . ." on its own does not amount to a proffer of good title satisfying a strict construction of section 2301.465(g) of the occupations code to justify the imposition of stiff penalties after Liberty has already paid BGMH for the inventory in question. *See Brown*, 156 S.W.3d at 564 (requiring strict construction of statute imposing penalty); *see Black's Law Dictionary* 1226 (7th ed. 1991) (proffer means "[t]o offer or tender (something, esp. evidence) for immediate acceptance."). The Board's conclusion that the inventory was timely repurchased is supported by substantial evidence and is a reasonable interpretation of the statute it is entrusted to enforce. *Moore*, 845 S.W.2d at 823.[13]

---

[12] When the Board's enforcement division discovered that Liberty had repurchased its inventory, it closed its file on the matter.

[13] Even assuming that BGMH's letter proffered good title to the inventory from both BGMH and the alleged lienholder, construing the statute to require Liberty to instantaneously pay $7,010,439 to BGMH would lead to absurd results. Under section 2301.453(c) of the occupations code, a

Therefore, we affirm the Board's conclusion that Liberty timely repurchased BGMH's inventory.

Because we are affirming the Board's conclusion, BGMH is not entitled to the statutory penalties

it was seeking. Accordingly, we overrule BGMH's fourth and fifth issues on appeal.

**The Board did not err in concluding that BGMH stood *in pari delicto* with Liberty**

In its sixth issue on appeal, BGMH asserts that, although there is evidence that

Liberty engaged in unfair dealing and bad faith in its handling of coaches 512, 515, and 516, there

manufacturer, distributor, or representative is required to provide notice of a franchise agreement termination. *See* Tex. Occ. Code Ann. § 2301.453(c). With certain exceptions, notice must be given to the dealer at least 60 days before the termination. *See id.* However, the code does not specifically mention any notice requirement for a dealer terminating the franchise agreement. The statutes in question seem to be designed to protect a dealer from a manufacturer's termination but do not address the situation of a dealer terminating a franchise agreement.

In addition, section 2301.465 of the occupations code requires a manufacturer to repurchase a dealer's inventory after termination of a franchise agreement no later than the 60th day after the franchise is terminated. *Id.* § 2301.465. Further, section 2301.465(g) subjects a manufacturer to penalties if the manufacturer does not repurchase the inventory within 60 days or at an earlier time if the dealer and any lienholders proffer good title to the inventory. *Id.* § 2301.465(g).

Allowing dealers to terminate a franchise agreement without notice of termination and also requiring immediate repurchasing of the inventory would seem contradictory to the purpose of the statute "to ensure a sound system of distributing and selling motor vehicles" and "to prevent fraud, unfair practices, discrimination, impositions, or other abuse . . . ." *Id.* § 2301.001 (West 2004); *see* Tex. Gov't Code Ann. §§ 311.021(3), .023(1), (5) (West 2005); *Villareal v. San Antonio Truck & Equip.*, 994 S.W.2d 628, 632 (Tex. 1999) (language not interpreted in way leading to absurd conclusions if another more reasonable interpretation available).

Because the Board is charged with enforcing the provisions of the occupations code dealing with franchise agreements and because the Board's interpretation of the repurchase requirement for when a dealer terminates an agreement does not contradict the plain meaning of any statute, the Board's construction is entitled to serious consideration. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993). Accordingly, the Board's conclusion that a manufacturer's repurchase of inventory within 33 days of a dealer's termination, even with an alleged proffer of title, is timely is a reasonable interpretation of the occupations code.

is no evidence that BGMH was equally at fault. First, BGMH asserts that the concept of unclean hands or *in pari delicto* is not mentioned as a defense to a manufacturer's violation of the duty of good faith and fair dealing under the occupations code. Consequently, BGMH insists that the Board erred by comparing the fault of the two parties and by concluding that neither party was without fault or wanted to continue the relationship. BGMH also contends these determinations go beyond the Board's authority to resolve violations of the occupations code. BGMH further asserts that, even if the doctrine applies as a defense to violations of the duty of good faith and fair dealing, the doctrine would not apply to the facts in this case. Specifically, BGMH asserts that the conduct allegedly constituting its bad faith occurred months before Liberty's bad faith conduct, had no direct connection with Liberty's bad faith conduct, and, therefore, cannot form the basis of an unclean hands determination. *1st Coppell Bank v. Smith*, 742 S.W.2d 454, 464 (Tex. App.—Dallas 1987, no writ) ("Conduct with regard to a separate transaction will not be held to constitute unclean hands.").

BGMH asserts that, even if it were true that BGMH misled Konigseder about whether it had already decided to leave Florida, an individual cannot be induced into signing a franchise agreement based on such a statement. Further, BGMH asserts that even if Gregg's statement was improper, the statement had no connection to Liberty's handling of coaches 512, 515, and 516 months later.

We disagree that the Board should not have considered BGMH's actions when determining whether to impose a penalty upon Liberty. The occupations code imposes a duty to act in good faith on both dealers and manufacturers. Tex. Occ. Code Ann. § 2301.478 (b). Determining

35

whether a party acts in good faith entails an equitable evaluation of the behaviors in question, which the Board made in this case. BGMH was under the same responsibility to act in good faith as Liberty. It was, therefore, appropriate for the Board to consider BGMH's conduct when determining if Liberty violated the duty of good faith and fair dealing.

Further, when determining what amount, if any, to impose as a penalty for a violation of the occupations code, one of the factors the Board is required to consider is "any other matter justice may require." *Id.* § 2301.801(b)(6). This factor is sufficiently broad enough to include the bad faith conduct of another involved party. Based on the conduct of both parties, the Board held they were equally at fault in the deterioration of the franchise relationship and assessed no civil penalty.

Contrary to BGMH's assertions, the alleged actions of bad faith committed by BGMH are not separate, collateral transactions having no relationship to Liberty's later refusal to turn over coach 516. The false statement that induced Liberty to enter the 2001 agreement was an integral component of the demise of the business relationship between BGMH and Liberty.

For the reasons previously stated, we hold that the Board properly considered BGMH's actions when determining whether to impose a penalty against Liberty based on BGMH's bad faith claim.

The Board's determination that no civil penalty should be assessed against Liberty because both parties stand *in pari delicto* is supported by substantial evidence. BGMH's conduct during the deterioration of the franchise agreement supports a finding of bad faith. First, the Board concluded, based on the long business relationship between the two parties, that Gregg knew that

36

the Florida market was very important to Liberty and that Liberty would not have entered into the new franchise agreement with BGMH if it knew BGMH had withdrawn from Florida. BGMH had already sold its Florida dealership by the time Gregg told Liberty he was unsure about his plans for his Florida dealership and by the time Liberty agreed to enter into the 2001 franchise agreement. In addition, BGMH, soon after selling its dealership, surrendered its Florida dealer's license. Rather than keeping its Florida dealership open until April 2001, which was permissible under the sales agreement with National RV, BGMH closed its facilities on February 8, 2001. After BGMH closed its business in Florida and after having given up any "present business" in Florida, it attempted to use the non-compete provision in the franchise agreement to prevent Liberty from opening a Florida dealership. Finally, according to Liberty, BGMH ignored Liberty's repeated attempts to contact BGMH about purchasing BGMH's inventory.

Because we hold that the Board correctly considered BGMH's own bad faith conduct when determining whether to impose a penalty on Liberty and because we hold that the Board's conclusion that BGMH stood *in pari delicto* with Liberty was supported by substantial evidence, we overrule BGMH's sixth issue on appeal.

**The court has jurisdiction over Liberty's cross-appeal**

In a motion to dismiss, BGMH also asserts that Liberty's cross-appeal must be dismissed because this Court lacks jurisdiction. BGMH contends that this Court lacks jurisdiction because Liberty voluntarily paid the $1,000 civil penalty assessed against it before perfecting its appeal and that its appeal is therefore moot. The civil penalty was to be paid "within 30 days of the date on which [the Board's] order becomes final." Liberty paid the civil penalty before it filed a

petition for judicial review in the district court. *See Highland Church of Christ v. Powell*, 640 S.W.2d 235, 236 (Tex. 1982) (if judgment debtor pays judgment against him voluntarily, "the cause becomes moot"). If the Court decides not to dismiss Liberty's cross-appeal, BGMH urges this Court to remand Liberty's case to the district court to obtain relevant evidence to the jurisdictional issue BGMH raises. *See* Tex. Occ. Code Ann. § 2301.753 (West 2004) (appeal in court of appeals subject to remand to district court with instructions from court of appeals).

Alternatively, BGMH insists Liberty's cross-appeal must be dismissed because Liberty lacks capacity to perfect an appeal. Liberty is an Illinois corporation that has conducted business in Texas but has no certificate of authority to do business. Thus, BGMH asserts article 8.18 of the Texas Business Corporation Act precludes Liberty from maintaining an appeal in the Travis County District Court and from removing it to this Court. This suit arises from business transactions in Texas and article 8.18 of the corporation act prohibits a corporation without a certificate of authority from maintaining a suit in Texas. Texas Business Corporations Act, 54th Leg., R.S., ch. 64, art. 8.18, 1955 Tex. Gen. Laws 239, 301.

We disagree. When Liberty paid the $1,000 civil penalty, it wrote a cover letter to the Board indicating its intent to appeal the order of the Board. Because Liberty indicated its desire to appeal the decision of the Board when paying the penalty, Liberty's appeal was not rendered moot. *Miga v. Jensen*, 96 S.W.3d 207, 211-12 (Tex. 2002) ("payment on a judgment will not moot an appeal if the judgment debtor clearly expresses an intent that he intends to exercise his right of appeal and appellate relief is not futile"; because payment was coupled with express intent to appeal, right to contest judgment not waived).

In addition, article 8.18 of the business corporation act does not prohibit a foreign corporation from defending itself in suits brought against them in Texas. Texas Business Corporations Act, 54th Leg., R.S., ch. 64, art. 8.18(B), 1955 Tex. Gen. Laws 239, 301 (allowing foreign corporations to defend actions against them in Texas); *see State v. Cook United, Inc.*, 463 S.W.2d 509, 515-16 (Tex. Civ. App.—Fort Worth 1971) (cross-action by foreign corporation without certificate of authority permissible under article 8.18(B) because defensive in nature), *modified on other grounds*, 469 S.W.2d 709 (Tex. 1971). BGMH initiated this suit against Liberty in Denton County, Texas.

Even assuming that article 8.18(A) of the corporation act bars Liberty's cross-appeal, section 2301.751(a) of the occupations code allows any "party to a proceeding affected by a final order . . . of the [B]oard . . . [to] seek judicial review of the action under the substantial evidence rule in [Travis County district court or this Court]." Tex. Occ. Code Ann. § 2301.751(a). Section 2301.751 is a special grant of jurisdiction for an appeal from a Board proceeding, and, therefore, controls over the general bar listed in article 8.18(A) of the corporation act. *See* Tex. Gov't Code Ann. § 311.026(b) (West 2005) (code construction act provides that, where there is conflict between two provisions, special provision controls over general provision unless general enacted later and manifests intention that general prevails). Liberty is a party affected by the final order of the Board, and, therefore, it may seek review in the district court and in this Court.

Accordingly, we overrule BGMH's motion to dismiss and hold that this Court has jurisdiction to hear Liberty's appeal, that Liberty has the capacity to seek appellate review of the

Board's decision as an affected party, and that the case need not be remanded for evidentiary purposes.

**BGMH's Complaint was not Time-barred**

Now that we have addressed BGMH's complaints on appeal, we turn to Liberty's claims. In its first issue, Liberty asserts that BGMH's formal complaint was not filed with the Board within the time required by the occupations code and is, therefore, time-barred. Under section 2301.453(e)(1) of the occupations code, a franchise dealer may file a protest with the Board regarding the termination of a franchise agreement within 60 days after receiving notice of the termination or within the time specified in the notice of termination, whichever time period is longer. Tex. Occ. Code Ann. § 2301.453(e)(1); *Ford Motor Co. v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 21 S.W.3d 744, 755 (Tex. App.—Austin 2000, pet. denied).

Liberty sent the non-renewal letter to BGMH on July 30, 2001. BGMH received the letter on July 31, 2001, but did not file a complaint with the Board until August 2002, more than a year later. Liberty insists this was too late. Further, Liberty argues that, even if the 2001 agreement was not terminated until December 13, 2001, when BGMH insisted Liberty repurchase its inventory, BGMH's complaint was still untimely because it was not filed within 60 days of December 13, 2001. Alternatively, Liberty asserts that, even if the franchise did not terminate until January 31, 2002, as specified in Liberty's termination letter, the complaint was still untimely because it was not filed within 60 days after January 31, 2002. Consequently, Liberty asserts that BGMH's attempt to

40

enforce violations of the occupation code relating to the required notice in a franchise termination was time-barred.

However, the time periods listed in section 2301.453(e) do not apply to this case because BGMH's complaint was not a protest to the termination of a franchise agreement. *See* Tex. Occ. Code Ann. § 2301.453(e). Although the Board concluded BGMH's demand for repurchase terminated the franchise, the demand invoked the winding-up provisions of the occupations code, which require a manufacturer to repurchase inventory from a dealer after termination of a franchise agreement, not after a termination request.

The complaint that culminated in the order under review in this case was part of a *Subaru* hybrid-resolution process, not a protest of termination. The complaint was triggered by BGMH filing suit in Denton County, seeking declaratory relief regarding alleged violations of the occupations code. *Subaru*, 84 S.W.3d 212. Section 2301.453(e), which is the statute cited by Liberty as barring BGMH's complaint, is not a statute of limitations concerning the hybrid claims resolution process. Therefore, the 60-day time-limitation is inapplicable.

The statute of limitations governing this case is found in section 2301.7025 of the occupations code. Section 2301.7025 establishes a four-year statute of limitations for a license holder to file an action with the Board unless an alternative time period is specified by the occupations code. Tex. Occ. Code Ann. § 2301.7025 (West 2004). BGMH's complaint was filed within the four-year statute of limitations and is, accordingly, not time-barred. Therefore, we overrule Liberty's first issue on appeal.

41

**The Board Properly Assessed a Penalty Against Liberty for Failing to use the Statutorily-mandated Termination Language**

In its second issue on appeal, Liberty insists the Board erred in imposing a penalty against Liberty for not including statutorily required language in its July 30, 2001 non-renewal letter. Section 2301.453 of the occupations code requires the inclusion of a notice to dealer proviso in termination documents. *Id.* § 2301.453(c)(2). Because Liberty did not use the required language, the Board issued a $1,000 penalty against Liberty.

Konigseder testified that the statutory language was not included in the letter because he did not believe the events leading up to termination of the agreement qualified as a Texas dispute and because all of the correspondence between BGMH and Liberty had gone through Tennessee, not Texas. Therefore, Liberty did not believe it was necessary to include the termination language imposed by Texas law. Further, Liberty contends that section 2301.453(c) does not apply to this case. Rather, Liberty insists that this case is governed by section 2301.453(d).

When describing the termination requirements in section 2301.453(c), the first sentence of subsection (c) states "[e]xcept as provided in [s]ubsection (d) . . . ." *Id.* § 2301.453(c). Section 2301.453(d) specifies that if a dealer fails to conduct its sales and service operations for seven or more consecutive business days, then a manufacturer may provide a notice of termination of the franchise agreement to the dealer fifteen days before the date of termination rather than the sixty days specified in section 2301.453(c). *Id.* § 2301.453(d). In other words, if a dealer abandons its facility, there is a shorter termination period. However, section 2301.453(d) does not specify which, if any, of the requirements for termination specified in section 2301.453(c) must be provided in this shortened notice termination.

Liberty avers that, because BGMH ceased doing business in Florida in March 2001 after cancelling its license, BGMH failed to conduct its operations during customary business hours for seven consecutive business days while the 2001 franchise agreement was in effect. Consequently, Liberty asserts it was free to terminate with 15 days' notice and was not required to include any specific language in the termination notice, serve the termination notice in any specific manner, or serve the termination notice on the Board.

We disagree. The Board argues that section 2301.453(d) does not apply to the facts in this case. Section 2301.453(d) applies when a "licensed dealer fails to conduct its customary sales and service operations." *Id.* The phrase "licensed dealer" does not appear in subsection (c). Consequently, the Board insists that subsection (d) does not apply in this case because the Board did not license BGMH to engage in business in Florida, nor has BGMH abandoned any of its Texas dealerships, for which BGMH obtained a license from the Board. Therefore, the Board contends that all of the requirements listed in subsection (c) for termination needed to be complied with.

Alternatively, the Board asserts that section 2301.453(d) does not eliminate the language requirement set out in section 2301.453(c). Even adopting Liberty's assertion that abandonment of a dealership qualifies as good cause to terminate a franchise agreement with a shorter termination time period, it does not necessarily follow that all the requirements listed in subsection (c) need not be satisfied. The notice to dealer language listed in subsection (c) performs a function that is independent of the time period for termination. The notice informs the dealer of its right to protest. The Board argues that the right to protest a termination is as important under a subsection (d) termination as it is under a subsection (c) termination. The Board suggests that a

dealer who abandons its dealership may avoid the application of sanctions of the occupations code by showing that the abandonment was the result of (1) an act of God, (2) a work stoppage or delay because of a strike, (3) an order given by the Board, or (4) another cause beyond the control of the dealer. *See id.*

The Board's interpretation of the occupations code, which it is charged with enforcing, is reasonable and does not contradict the plain meaning of the statute; therefore, the agency's interpretation is entitled to serious consideration. *Moore*, 845 S.W.2d at 823. Accordingly, we affirm the Board's imposition of a $1,000 fine against Liberty—one-tenth of the maximum fine allowable—for its failure to provide notice of termination with the language required by the occupations code. *See* Tex. Occ. Code Ann. § 2301.801 (West 2004) (imposing maximum of $10,000 per violation). We therefore overrule Liberty's second issue on appeal.

**Liberty Breached the Duty of Good Faith and Fair Dealing**

In its third issue, Liberty asserts that there is no evidence to support the Board's conclusion that Liberty engaged in bad faith conduct. Although generally there is no implied duty to engage in good faith and fair dealing under Texas contract law, *see*, *e.g.*, *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983), section 2301.478(b) of the occupations code imposes a duty of good faith and fair dealing between two parties to a motor vehicle franchise agreement. Tex. Occ. Code Ann. § 2301.478(b) ("Each party to a franchise owes to the other party a duty of good faith and fair dealing that is actionable in tort.").

Generally, a party does not act in bad faith if its actions are permitted under the contract. *Cf. Amoco Prod. Co. v. Texas Meridian Res. Exploration, Inc.*, 180 F.3d 664, 669-70 (5th

44

Cir. 1960) (court concluded Amoco's conduct within contractual rights and therefore no "issue of material fact concerning Amoco's good faith"); *see also National Labor Relations Bd. v. Cummer-Graham Co.*, 279 F.2d 757, 760 (5th Cir. 1960) (if party had legal right to insist upon terms of its proposal, then exercise of right is not evidence of bad faith).

In its order, the Board listed the following evidence of Liberty's bad faith toward BGMH:

> November 26 [2001]. Liberty notifies the dealership that "a recapitulation of receivables and payables" showed that [BGMH] owes Liberty $133,414.19 for "service work and other items". Liberty demands immediate payment—a marked change in the course of dealing—and threatens curtailment of new product until the amount is paid.[14]
>
> November 28. [BGMH] tenders two checks. One, in the amount of $104,284.29 is payable directly to Liberty. The second, for $29,129.90, is to be held in trust by Liberty's law firm pending a reconciliation of accounts.
>
> November 29. Liberty denies that the lesser amount is in dispute and additionally demands payment in full for coaches #512, #515 and #516, which are ready for delivery. [BGMH,] however, has not received certificates of origin from Liberty on coaches 512 and 515. Without these documents, [BGMH's] floorplan lender will not fund the purchases.
>
> December 4. With documentation complete and funding available to purchase coach 516, [BGMH] requests delivery. Liberty refuses to deliver 516 because coaches 512 and 515 have not been paid for. [BGMH] loses the sale on 516.

---

[14] The Board concluded that this behavior was a marked change in the course of dealing because, as BGMH's attorney testified, Liberty previously had sent its records to BGMH's chief financial officer, who would then reconcile the records against the dealership records. After the records were reconciled, checks were exchanged, and the accounts were settled. This reconciliation was done about once a year.

45

December 10. Liberty requests release of the $29,129.90 check and again demands payment in full for coaches 512 and 515. The deadline for purchase is set for "the close of business on December 12, 2001."

(Footnotes omitted.)

Liberty insists that the relationship between the two parties had deteriorated to such a degree that it had to demand immediate payment on November 26, 2001, in order to protect its own interests. It urges that the actions the Board found to constitute statutory bad faith were instead commercially reasonable attempts to mitigate the damages caused by BGMH's misconduct. *See*, *e.g.*, *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (Texas law requires claimant to mitigate damages if can be done with reasonable amount of exertion). Additionally, Liberty insists that it engaged in those actions only after it was clear BGMH was attempting to prevent Liberty from taking reasonable efforts to protect its customer base and market presence in Florida.

In support of this assertion, Liberty highlights the history between the two parties in which BGMH had previously issued a hot check to Liberty[15] and misled Liberty about whether it had plans to close its Florida dealership. Liberty also points to the provision in the franchise agreement that obligated the parties to settle warranty and parts accounts on a 30-day basis and notes that Liberty's demand for payment was made over 30 days after BGMH had lapsed on its obligations to pay on warranty and parts accounts. Based on the contract provision and the fact that payment was past due, Liberty insists it was not bad faith to demand payment for the amount due.

---

[15] In 1991, BGMH issued a check for more than half-a-million dollars to pay for one of Liberty's coaches. However, Gregg called Liberty and stated that the check was no good. Rather than preventing the sale of the coach, Liberty agreed to allow BGMH to pay for the coach later. Liberty was paid three weeks later.

46

Regarding coaches 512 and 515, Liberty insists that BGMH was obligated under the terms of the franchise agreement to purchase those coaches, and, therefore, it was not bad faith on Liberty's part to insist that BGMH purchase the coaches. Under the franchise agreement, BGMH was required to purchase 100% of the coaches Liberty produced. However, BGMH could give written notice to Liberty that it wanted to limit its purchase requirement to certain coaches or a certain number of coaches. If BGMH did provide such notice, it was still required to purchase "up to five (5) of the then unfinished units in [Liberty's] production facility at the time [BGMH] gives such notice. These five (5) units will be completed and delivered in the normal course of business . . . ." Based on this contract language, Liberty insists that, even if BGMH's refusal to purchase coaches 512 and 515 could be construed as written notice limiting the number of coaches to be purchased, BGMH would still be required to purchase 5 units in the normal course of business, of which coaches 512 and 515 would be two.

Liberty further claims that delivering coaches 512 and 515 to its Florida dealership was not an act committed with bad faith because, as stated by Konigseder in his deposition, the coaches were delivered to Florida for storage purposes only and were not offered for sale from Liberty's Florida facility. In addition, Liberty insists that if it had sold the coaches on its own, Liberty would have paid BGMH the commission it was entitled to under the 2001 agreement. Similarly, Liberty insists that there is no evidence that it caused BGMH to lose the sale for coach 516.

However, the Board's determinations were based on more than Liberty's attempts to demand payment owed by BGMH. Although Liberty claims that it was only asking BGMH to pay

amounts "due and owing" as a commercially reasonable and self-protective measure, Liberty's delivering coaches to its own dealership rather than to BGMH was not contemplated under the terms of the franchise agreement. Under the terms of the franchise agreement, BGMH was supposed to receive all coaches produced and was supposed to receive a commission on those occasions when a coach was delivered directly to a customer. Liberty delivering the coaches to its own dealership was not an option contemplated under the terms of the agreement.

In delivering these coaches, Liberty did not follow its usual practice of providing BGMH with an invoice and certificate of origin, which BGMH's lender required to complete a purchase. Further, Liberty conditioned its delivery of coach 516, for which BGMH had a purchaser, on BGMH paying for coaches 512 and 515, which the Board characterized as "holding 516 hostage and killing the sale."

The Board's decision that Liberty violated the duty of good faith and fair dealing is supported by substantial evidence. Accordingly, we overrule Liberty's third issue on appeal.

**BGMH's Actions did not Nullify the Franchise Agreement**

In its fourth issue, Liberty asserts that, because BGMH fraudulently induced Liberty to enter the 2001 franchise agreement, there is no valid franchise agreement that can be enforced against Liberty, and, therefore, Liberty cannot have committed any franchise agreement violations. As a result of the alleged fraudulent inducement, Liberty insists the 2001 franchise agreement never existed or was a nullity. *See Polar Bear Ice Cream Co., Inc., v. Earhart*, 603 S.W.2d 388, 389-90 (Tex. Civ. App.—Waco 1980, writ dism'd w.o.j.) (fraud in inducement fatal to contract). Consequently, Liberty contends that the Board's adoption of the findings and conclusions presuming

48

the existence of the 2001 agreement, including the imposition of a civil penalty on Liberty, is reversible error and urges this Court to hold that the Board should have concluded Liberty committed no statutory violations.

Alternatively, Liberty contends that BGMH materially breached or repudiated the 2001 franchise agreement by failing to maintain a Florida dealership and by insisting Liberty repurchase its inventory. In either case, Liberty insists it was excused from any further performance under the agreement and insists the occupations code no longer applied. *See*, *e.g.*, *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) (material breach by one party to contract excuses other party's performance); *Glass v. Anderson*, 596 S.W.2d 507, 513 (Tex. 1980) (one party's repudiation after time for performance excuses other party from contractual obligations).

The Board has the responsibility of regulating the distribution, sale, and leasing of motor vehicles. Tex. Occ. Code Ann. § 2301.151(a). In fulfilling this responsibility, part of the Board's function is to determine whether any statutorily prohibited behaviors or other occupation code violations occurred, which is what the Board did in this case.[16] The Board did not find that the franchise agreement between the parties did not exist or was a nullity, nor did the Board conclude the franchise agreement was *fraudulently* induced. Even after Liberty complained about the absence of a finding that the contract was induced by fraud, the Board adopted the proposal for decision in its entirety without adding any finding that the franchise agreement was induced by fraud.

---

[16] It is worth noting that the occupations code makes certain behaviors statutory violations "notwithstanding the terms of any franchise." *See* Tex. Occ. Code Ann. §§ 2301.453-.455 (West 2004).

49

Even assuming that BGMH fraudulently induced Liberty into signing the 2001 franchise agreement, a contract induced by fraud is voidable, not void, and will be avoided only if the complaining party proves it has the right to avoid the contract. *Swain v. Wiley College,* 74 S.W.3d 143, 146 (Tex. App.—Texarkana 2002, no pet.). Therefore, the 2001 franchise agreement would remain in effect until Liberty obtained a judicial declaration that the contract was void. Liberty did not obtain this declaration, so the franchise agreement remained in effect.

Further, the Board did not conclude that BGMH materially breached the franchise agreement or repudiated the agreement by not having a Florida dealership. Although the franchise agreement mentioned BGMH's Tennessee and Texas dealerships, it did not specifically mention a Florida dealership or impose an obligation upon BGMH to keep a Florida dealership open.

Rather than concluding that BGMH's demand that Liberty repurchase its inventory breached or repudiated the franchise agreement, the Board concluded that BGMH's demand terminated the agreement, which we previously held was reasonable and did not contradict any of the statutes the Board was charged with enforcing. Accordingly, we hold that there was a valid franchise agreement in existence between BGMH and Liberty. Because there was a valid franchise agreement between Liberty and BGMH and because the Board has the authority to regulate motor vehicle franchise agreements, the Board properly considered whether Liberty's actions violated provisions of the occupations code. Therefore, we overrule Liberty's fourth issue on appeal.

**The Board's Order did not Exceed its Authority**

In its final issue, Liberty contends that this case should be remanded to the Board with instructions that the scope of the Board's final order, including its Findings of Fact and Conclusions

of Law, is limited to Texas. Liberty argues that the 2001 franchise agreement, like its predecessor, was a national franchise agreement, and, therefore, the Board's conclusion that Liberty's July 30, 2001 non-renewal letter did not terminate the franchise agreement because it did not contain the statutorily required language is too broad. Liberty insists that, because the Board's conclusion is not limited in scope to Texas, it is beyond the Board's authority.

In addition to the conclusion that the non-renewal agreement did not terminate the agreement, the Board concluded that BGMH could have filed a complaint with the Board that would have led to a statutory stay keeping the 2001 franchise agreement in effect until the Board ruled on the complaint. Tex. Occ. Code Ann. §§ 2301.453(e), (f)(3), .803. Liberty insists the Board was not sensitive to the national implications of its decision because the Board's decision could have obligated Liberty to the franchise agreement outside Texas even though Liberty had acted within its contractual rights to terminate the agreement.

We do not agree with Liberty. Motor vehicle dealers derive the authority to engage in business in Texas from franchise agreements with manufacturers and from licenses the Board issues regarding each dealership's location. *Cf. id*. § 2301.257. The franchise agreement between Liberty and BGMH involved a Texas dealership and a dealer licensed by the state of Texas. The Board had the authority to determine that Liberty's non-renewal letter did not satisfy the occupation code's requirements for termination of a franchise agreement involving a licensed Texas dealer. The legislature granted the Board fact-finding responsibilities for alleged violations of the occupations code. *Subaru*, 84 S.W.3d at 224-25.

51

Further, Liberty's argument that the Board's conclusion that BGMH could have kept the franchise agreement in effect by filing a protest is too broad and has national implications is founded on an event that did not occur: BGMH did not protest the termination of its franchise agreement. Tex. Occ. Code Ann. § 2301.453(e). The franchise relationship is over, and we will not speculate about the possible implications of an action BGMH did not undertake. *Brown*, 156 S.W.3d at 566 (constitution forbids issuing advisory opinions).

Accordingly, we hold that this case does not need to be remanded to the Board with instructions requiring the Board's findings and conclusions be limited to Texas. Therefore, we overrule Liberty's final issue on appeal.

## CONCLUSION

Because we have overruled all of BGMH's and Liberty's issues on appeal, we affirm the order of the Board in all respects.

_____

David Puryear, Justice

Before Justices Kidd, Patterson and Puryear
    Justice Kidd Not Participating

Affirmed

Filed:   July 28, 2005

52