# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00239-CV

**Appellant, Star Houston, Inc. //**
**Cross-Appellant, Volvo Cars of North America, LLC n/k/a Volvo Car USA, LLC**

**v.**

**Appellees, Volvo Cars of North America, LLC n/k/a Volvo Car USA, LLC and the Board**
**of the Texas Department of Motor Vehicles // Cross-Appellees, Star Houston, Inc.**
**and the Board of the Texas Department of Motor Vehicles**

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-000052, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## O P I N I O N

Appellant Star Houston, Inc. and cross-appellant Volvo Car USA, LLC each appeal a Final Order of the Motor Vehicle Board. Star and Volvo had engaged in an administrative proceeding during which Star protested Volvo's termination of Star's Volvo franchise and Star in what it termed "counterclaims" alleged that several Volvo Dealer Incentive Programs each violated several provisions of Occupations Code chapter 2301. Star and Volvo petitioned for judicial review of the Final Order in Travis County district court. *See* Tex. Occ. Code § 2301.751(a). Star's and Volvo's suits for judicial review were consolidated into one suit, but before trial, Volvo removed the appeal and cross-appeal of the Final Order to this Court. *See id.* § 2301.751(b). And in both the trial court and this Court, the Motor Vehicle Board—the body that governs the Department of Motor Vehicles, *see* Tex. Transp. Code §§ 1001.001–.002, 1001.021,

1001.0221—has appeared as a responding party (either defendant, appellee, or cross-appellee, as the case may be) to defend the Final Order.

In two issues, Volvo maintains that the Board erred by concluding that two of the Dealer Incentive Programs—CSI and SSI—violated each of Occupations Code sections 2301.467(a)(1) and 2301.468. In three issues of its own, Star maintains that all six of the Dealer Incentive Programs violated Occupations Code sections 2301.468, 2301.467(a)(1) and (a)(2), 2301.476(c)(2), 2301.451, 2301.473(2)(C), and 2301.478(b).[1] Also, the Board brings a standing challenge to Volvo's cross-appeal of the Final Order. We conclude that Volvo has standing to bring its cross-appeal and affirm the Final Order.

## BACKGROUND

Star had been a Volvo dealer for decades, operating under a 1970 franchise agreement with Volvo Car USA, the brand's U.S. distributor. But for some time, Star's sales of Volvo cars had lagged behind those of virtually every other Volvo dealer in the same region and behind other dealers' sales in the same region selling cars of similar brands.[2] Volvo personnel met with Star personnel, including Star's owner, over many years to suggest steps Star could take to improve its sales numbers and overall business to Volvo's satisfaction. But the two sides never settled on a mutually agreed approach.

For both Star and its other franchised dealers, Volvo operates incentive programs under which the dealers can take certain actions in exchange for bonus payments or other boons

---

[1] Star does not contest the Board's approval in the Final Order of Volvo's termination of Star's Volvo franchise.

[2] Volvo considers itself as competing in the same market segment as Mercedes-Benz, BMW, Audi, Lexus, Acura, and Infiniti.

from Volvo. Six such programs—the Dealer Incentive Programs—are at issue here. Although Star sometimes benefitted from some of the Programs, overall Star usually did not take the actions that the Programs incentivized and so regularly did not receive as much in bonus money as other Volvo dealers received. The six Dealer Incentive Programs are CSI, SSI, the Facility Investment and Support Initiative (FISI), Volvo 360, Retailer Standards, and Factory Options / Package Bonus / Sales Mix.

*CSI and SSI*

The CSI and SSI programs use customer-survey results to reward dealers. When a customer buys a car from a dealer or takes a car to the dealer for service, the customer is afterward asked to complete a survey. Although the surveys usually include dozens or more questions, for purposes of CSI and SSI bonus payments, only four of the questions matter, and these are the "enabler questions." The enabler questions for customers who bought cars concern the customer's opinion about the dealer's facilities, whether the customer would recommend the dealer to others, whether the customer was satisfied with the features and controls of the car, and whether the dealer has reached out to the customer since the latter took delivery of the car. The enabler questions for customers who brought cars to the dealer for service concern the customer's opinion of the waiting area, whether the customer was satisfied with the explanation of the work done, whether the customer was satisfied with the condition of the car after it was serviced, and whether the customer received any follow-up from the dealer. The questions on the surveys that are not treated as enabler questions cover a host of other topics about the customer's satisfaction, but only the enabler questions are scored for bonus purposes. The customer does not necessarily know which questions are the enabler questions.

3

For the enabler questions, the customer is asked to give the dealer a score from one to ten (or sometimes one to five), with the highest number reflecting highest customer satisfaction. But not all scores are included in the bonus-computation process. Volvo uses a method called "top-box scoring"—only the highest scores (nines or tens out of ten or fives out of five) are credited to the dealer receiving such scores; any score that is not a top-box score counts as a zero. High-scoring dealers receive CSI or SSI bonuses, but Star's non-top-box scores on the CSI and SSI surveys—particularly because of Star's dated facilities—meant that it only rarely achieved CSI or SSI bonus payments.

### FISI

For dealers who conform their facilities to Volvo's specifications for brand image and exclusivity, Volvo would pay the dealers a bonus under the FISI program. Volvo capped FISI bonus payments at 50% of the costs that the dealer spent on the facilities improvements that earned them the FISI bonuses.

### Volvo 360

The Volvo 360 program was used to recycle the fleet of formerly leased Volvos into used-car sales. To receive Volvo 360 bonuses, dealers needed to buy a certain number of Volvos that had been returned after their leases had ended, certify a certain percentage of those cars as "certified pre-owned," and sell all of the certified cars. Volvo 360 used an auction system under which the dealer who had originated the lease had the right to bid first to buy the formerly leased car at a certain price. If that dealer refused, other Volvo dealers could bid to buy the car.

***Retailer Standards***

Retailer Standards represented Volvo's effort to incentivize certain business practices in its dealer community. To earn these bonuses, dealers needed to submit a yearly business plan and monthly financial statements, achieve quarterly training-certification goals, use and adhere to the Dealer.com website and communication standard, use an approved lead-management system, subscribe to a particular online scheduling platform, and display pricing for basic services online.

***Factory Options / Package Bonus / Sales Mix***

Star frequently received this category of bonuses. It did so by selling Volvo-brand options as part of sales of new cars.

***History of this dispute***

In 2016, Volvo notified Star that it was terminating their franchise relationship. Star initiated the underlying proceeding before the Department of Motor Vehicles, the state agency charged with regulating vehicle-dealer franchises, *see generally* Tex. Occ. Code §§ 2301.001–.853, to contest the termination of its Volvo franchise. The Department referred Star and Volvo to the State Office of Administrative Hearings for a contested-case hearing. *See id.* § 2301.704. Star's live pleading for the contested-case hearing not only sought relief under Star's protest of the termination of its franchise but also pleaded "counterclaims" against Volvo that the six Dealer Incentive Programs each violated six different statutes.

Two administrative-law judges (ALJs) conducted a six-day contested-case hearing and then issued a Proposal for Decision (PFD) resolving the parties' claims and defenses. The ALJs in the PFD rejected Star's protest to the termination of its franchise and rejected most of

Star's counterclaims that the Dealer Incentive Programs were unlawful under the six statutes that Star raised. However, the ALJs in the PFD concluded that the CSI and SSI programs violated Occupations Code sections 2301.467(a)(1) and 2301.468. Despite so concluding, the ALJs in the PFD also ruled that "[s]anctions, penalties, and further orders are not appropriate in this case, and further declaratory decision or orders are not required." Thus, Star was awarded no relief for the unlawfulness of the CSI and SSI programs.

The PFD has a two-part structure—(1) a lengthy background recitation of the facts, legal framework, and procedural history relevant to the contested case, all followed by (2) findings of fact numbered 1 through 243 and conclusions of law numbered 1 through 24. After both sides filed exceptions to the PFD, the ALJs made small changes to two of the PFD's numbered findings of fact, neither of which are at issue here. The administrative proceeding and the PFD, as amended, were then presented to the Motor Vehicle Board. The Board issued its Final Order, in which it said that after "having considered the record" of the contested case, it adopted "Conclusions of Law 1-24 and Findings of Fact . . . 1-243" from the PFD, as amended, and denied "all remaining motions, exceptions, or objections, of any party." (The Final Order does not say that the Board adopted all or any part of the PFD's lengthy background section.)

Star and Volvo then filed their petitions for review of the Final Order in Travis County district court. They answered each other's petitions, and the Board appeared as a defendant to answer each petition as well. Before there could be a trial, Volvo removed the parties' appeal and cross-appeal of the Final Order to this Court.

6

# STANDARD OF REVIEW

We review the Final Order under the substantial-evidence rule, which is found in the Administrative Procedure Act (APA). *See* Tex. Gov't Code §§ 2001.002, 2001.174; Tex. Occ. Code § 2301.751(a), (c); *Hyundai Motor Am. v. New World Car Nissan, Inc.*, 581 S.W.3d 831, 835 (Tex. App.—Austin 2019, no pet.). Under the rule, "[w]e must reverse or remand an agency decision 'if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole.'" *Dyer v. Texas Comm'n on Envtl. Quality*, 646 S.W.3d 498, 514 (Tex. 2022) (quoting Tex. Gov't Code § 2001.174(2)(E)). "In conducting this review, we 'may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence.'" *Id.* (quoting Tex. Gov't Code § 2001.174). "The agency's decision is 'presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise.'" *Id.* (quoting *Texas Comm'n on Envtl. Quality v. Maverick County*, 642 S.W.3d 537, 547 (Tex. 2022)). "The true test" under the substantial-evidence rule "is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Maverick County*, 642 S.W.3d at 544 (internal quotation omitted) (quoting *Texas Health Facilities Comm'n v. Charter Med.–Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)); *accord Jaguar Land Rover N. Am. v. Board of Tex. Dep't of Motor Vehicles*, No. 03-16-00770-CV, 2017 WL 6756997, at *5 (Tex. App.—Austin Dec. 21, 2017, no pet.) (mem. op.).

Under substantial-evidence review, we must uphold agency findings of fact so long as "'more than a mere scintilla' of evidence supports them." *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 801 (Tex. 2019) (quoting *City of Dallas v. Stewart*, 361 S.W.3d 562, 566 (Tex.

2012)); *accord Public Util. Comm'n v. Texas Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021). "[T]he evidence [i]n the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence," requiring that we uphold the finding of fact under attack. *See Texas Indus. Energy Consumers*, 620 S.W.3d at 427 (internal quotations omitted) (quoting *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 793 (Tex. 1995)).

## VOLVO'S APPELLATE ISSUES

**I.**     **Volvo has constitutional standing to challenge the Board's rulings that CSI and SSI violate two statutes because those rulings could have preclusive effect.**

Before we reach Volvo's issues presented as cross-appellant, we must address a responsive argument made by the Board as cross-appellee—constitutional standing. *See Heckman v. Williamson County*, 369 S.W.3d 137, 150–51 (Tex. 2012) ("[I]f a plaintiff lacks standing to assert one of his claims, the court lacks jurisdiction over that claim and must dismiss it. Similarly, if the plaintiff lacks standing to bring *any* of his claims, the court must dismiss the whole action for want of jurisdiction."); *Bacon v. Texas Hist. Comm'n*, 411 S.W.3d 161, 179 (Tex. App.—Austin 2013, no pet.) (contrasting doctrines of constitutional standing and standing to appear in proceeding before administrative agency). Texas "standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman*, 369 S.W.3d at 154. To support standing, the injury "must be concrete and particularized, actual or imminent, not hypothetical." *Id.* at 155 (internal quotation omitted) (quoting *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008)).

The Board argues that Volvo lacks standing because the Final Order did not injure Volvo because the Board did not take any action or accord anyone any relief despite ruling that the CSI and SSI programs violated Occupations Code sections 2301.467(a)(1) and 2301.468. The

8

Board adopted the PFD's ruling that "[s]anctions, penalties, and further orders are not appropriate in this case, and further declaratory decisions or orders are not required." Volvo responds that it was aggrieved by the Final Order despite its lack of present action or relief because the rulings that the programs violated the two statutes could let other dealers "seek damages that resulted from the violation" of applying the programs to those dealers. Volvo is correct that the rulings that the programs violated the two statutes are not expressly limited to Star Houston.[3] Thus, other Volvo dealers who were subjected to CSI and SSI could raise against Volvo elsewhere the conclusions from the Final Order that those programs were deemed unlawful.

The Board's arguments are based on our precedent about standing for judicial review of a final agency order's findings of fact and conclusions of law. We have "held that one must be aggrieved by the final order and not merely by an underlying finding or conclusion to have standing to seek judicial review of that order." *GTE Sw. Inc. v. Public Util. Comm'n*, 37 S.W.3d 546, 548 (Tex. App.—Austin 2001, no pet.) (citing *Champlin Expl., Inc. v. Railroad Comm'n*, 627 S.W.2d 250, 252 (Tex. App.—Austin 1982, writ ref'd n.r.e.)). Thus, in *Champlin Exploration*, when a complainant before the Railroad Commission succeeded in securing an order that proration units in a certain field had violated special field rules, the complainant lacked standing to seek judicial review of another ruling in the same order, that the complainant's correlative rights had not been adversely affected by the improper proration units. *See* 627 S.W.2d at 251–52. We concluded that the predecessor version of the APA "d[id] not alter the general rule so as to permit [complainant] to maintain an appeal in this Court for the sole purpose of striking findings and conclusions with which it does not agree." *Id.* at 252 (citing Act of Apr. 8, 1975, 64th Leg., R.S.,

---

[3] They say simply, "The CSI/SSI bonus programs violate Code § 2301.467(a)(1)," and, "The CSI/SSI bonus programs violate Code § 2301.468."

9

ch. 61, § 19(a), (e), 1975 Tex. Gen. Laws 136, 146–47, *repealed and replaced in nonsubstantive recodification by* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, §§ 1, 46–47, secs. 2001.171, 2001.174, 1993 Tex. Gen. Laws 583, 749, 986 (codified at Tex. Gov't Code §§ 2001.171, 2001.174)).

But this rule of standing has exceptions, one of which Volvo raises: "where the finding or conclusion would operate as res judicata or collateral estoppel in a subsequent proceeding." *Id.*; *accord Texas Comm'n on Envtl. Quality v. Bonser–Lain*, 438 S.W.3d 887, 892 (Tex. App.—Austin 2014, no pet.). Volvo argues that the Final Order's rulings about the CSI and SSI programs would have preclusive effect in future proceedings:

> The error has the potential to cause Volvo further injury because Texas implemented a 'hybrid claims resolution process' for certain civil damages claims relating to the sale of motor vehicles in Texas. Under the process, if a franchised dealer establishes certain violations of the Occupations Code, including Sections 2301.467 and 2301.468, the dealer can seek damages that resulted from the violation.

(Internal citations omitted.) Volvo is referring in part to Occupations Code section 2301.805, under which a dealer can sue in court for damages or other relief provided for by the Deceptive Trade Practices–Consumer Protection Act[4] (DTPA) for violations of the statutory subchapter that contains Sections 2301.467 and 2301.468:

> Notwithstanding any other law, including [the DTPA], in addition to the other remedies provided by this subchapter, a person may institute an action under [the DTPA], or any successor statute to that [act], and is entitled to any procedure or remedy under that [act], if the person: . . . is a franchised dealer who has sustained damages as a result of a violation of: . . . Subchapter J of this chapter.

---

[4] *See* Tex. Bus. & Com. Code § 17.41.

10

Tex. Occ. Code § 2301.805(a)(2)(A). In such suits, the statute provides, courts must "give deference to the findings of fact and conclusions of law of the board contained in any final order that is the basis of the action." *Id.* § 2301.805(b); *cf. Autobahn Imports, L.P. v. Jaguar Land Rover N. Am., LLC*, No. 4:16-CV-1172-A, 2017 WL 2684055, at *5 (N.D. Tex. June 20, 2017) (example of such a suit with example of deference required by Section 2301.805(b)), *vacated on other grounds*, 896 F.3d 340 (5th Cir. 2018).

Accordingly, here, the question is whether the findings and conclusions made against Volvo's CSI and SSI programs will preclude Volvo from contesting the same issues in a future proceeding brought by a different dealer.[5] If so, Volvo has standing to contest the findings and conclusions. We conclude that the Final Order's findings and conclusions about the two statutory violations fit within the *Champlin Exploration* exception for standing to challenge agency findings or conclusions, *see* 627 S.W.2d at 252, because Section 2301.805 mandates that courts in future cases based on the Final Order give deference to the Final Order's findings and conclusions.[6] We thus reject the Board's standing argument and proceed to the merits of Volvo's cross-appeal.

---

[5] A Section 2301.805 suit *by Star Houston* would be a nonstarter because of other Board findings, which a court would have to defer to. *See* Tex. Occ. Code § 2301.805(b). For example, Star Houston's basic claim is that CSI and SSI bonuses paid to other dealers hampered its ability to make sales, but the Board found that "Star's assertion that its poor sales performance is due to bonuses paid to other dealers is unsubstantiated by the evidence." This finding would preclude Star Houston's ability to prove causation in a Section 2301.805 suit based on the Board findings and conclusions that CSI and SSI were unlawful. Similarly, the Board's conclusion that Star Houston was entitled to no relief on its claims should bind a court when deciding whether Star Houston sustained any damages. *See id.* § 2301.805(a); *see also J-W Power Co. v. Sterling Cnty. Appraisal Dist.*, No. 03-21-00069-CV, 2022 WL 2836807, at *3–5 (Tex. App.—Austin July 21, 2022, pet. filed) (mem. op.) (unsuccessful administrative proceeding precluded later lawsuit by same party when basic nature of claims brought in both proceedings was the same).

[6] Federal courts have often reached a similar conclusion. *See, e.g.*, *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 334–35 & n.7 (1980) (describing *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241 (1939)); *Conwill v. Greenberg Traurig, L.L.P.*, 448 F. App'x 434, 436–

**II.    Substantial evidence supported the Board's rulings that CSI and SSI required Star's adherence to unreasonable sales or service standards.**

In its first issue as cross-appellant, Volvo maintains that the Board erred by concluding that the CSI and SSI programs violate Occupations Code section 2301.467(a)(1). That statute provides that distributors may not "require adherence to unreasonable sales or service standards." Tex. Occ. Code § 2301.467(a)(1). As part of this issue, Volvo challenges portions of the findings of fact that the Board adopted to support its conclusion that the CSI and SSI programs violate the statute. The relevant findings of fact are:

228.    Sales and service are not optional endeavors for a car dealership in the way that a new facility or participation in the Volvo 360 program [are]. Every dealer must provide, or attempt to provide, the essential functions of vehicle sales and service.

229.    Unlike FISI or the Volvo 360 program, the amount of investment required to achieve the CSI/SSI bonus is amorphous at best.

230.    Volvo requires its dealers to adhere to certain sales and service standards by rewarding dealers on the basis of the limited CSI/SSI survey results.

231.    Although there was no quantitative analysis, the evidence presented in this case shows that the CSI/SSI sales and service bonus standards are unreasonable because the surveys themselves and the use of four questions and top-box scoring do not necessarily measure actual customer sales and service satisfaction.

. . . .

233.    Volvo has a legitimate interest in customers' opinions about dealerships' facilities, and it is not unreasonable that Star's flaws in that area should count against it.

234.    Lower-volume dealers are at an inherent disadvantage in the survey process.

---

37 (5th Cir. 2011) (collecting cases); *see also Camreta v. Greene*, 563 U.S. 692, 704 (2011) (there exist "'policy reaso[ns] of sufficient importance to allow an appeal' by the winner below" (quoting *Deposit Guar. Nat'l Bank*, 445 U.S. at 335 n.7)).

235. The use of only four questions and the top-box scoring of those questions is likely to discriminate against dealers on the basis of volume of sales.

Because the statute's relevant terms are not defined by Chapter 2301, we apply the ordinary meanings of the terms as they are used in the relevant context. *See In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 46 (Tex. 2021) (orig. proceeding); *Jaguar Land Rover N. Am.*, 2017 WL 6756997, at *8. In this context, "sale" means "[t]he transfer of property or title for a price"; "standard" includes the definitions "[a] model accepted as correct by . . . authority" and "[a] criterion for measuring acceptability"; and to "require" means "to ask, request, or desire (a person) to do something," "to ask for authoritatively," and "to call for as suitable or appropriate in a particular case." *Jaguar Land Rover N. Am.*, 2017 WL 6756997, at *8 (internal quotations omitted) (quoting *Sale*, Black's Law Dictionary (10th ed. 2014); *Standard*, Black's Law Dictionary (10th ed. 2014); *Require*, Webster's Third New International Dictionary (2002)).

Volvo's arguments on appeal proceed on roughly three tracks under the statute: there was not substantial evidence for the Board to decide that (1) the CSI and SSI programs are "sales or service standards," (2) Volvo "require[d] adherence to" the two programs by Star, and (3) the two programs are "unreasonable." *See* Tex. Occ. Code § 2301.467(a)(1).

First, there was testimony providing a reasonable basis for the Board to rule that the CSI and SSI programs were "standards" relating to "sales or service." Volvo's own expert testified on cross-examination, in response to a question about what "Volvo's measuring of Star's CSI and SSI scores" are "intended to gauge," that the scores "measur[e] the performance of aspects of Star's business as it relates to sales—customer satisfaction." Similarly, a Volvo senior manager testified that the CSI and SSI programs are based on customer-satisfaction survey results connected with dealerships' sales and service activities. These items from the testimony provided a

13

reasonable basis for deciding that the programs bore a relationship to sales or service. Next, the reasonable basis for deciding that the programs are "standards" included testimony that Volvo uses CSI and SSI scores as criteria for deciding when to terminate a dealer's franchise and did so with Star. The Volvo senior manager testified that one of the grounds for franchise termination that Volvo communicated to Star was its "[f]ailure to adequately serve the consuming public by providing inadequate product and customer service" and that the failure bore "a direct correlation to" Star's low CSI and SSI scores. He emphasized that Star's scores "are significantly worse than average," supporting Volvo's reasoning for terminating Star's franchise. Both Volvo's market manager and former senior manager concurred, each testifying that Star's low CSI and SSI scores were among the factors used when deciding to terminate the franchise. And Volvo's expert agreed that it would be reasonable to terminate Star's franchise based in part on its low CSI and SSI scores. From this testimony, there was a reasonable basis for deciding that CSI and SSI scores were criteria for measuring Star's acceptability as a continuing Volvo franchisee. *See Jaguar Land Rover N. Am.*, 2017 WL 6756997, at *8 (defining "standard").

Second, under the heading of "requir[ing] adherence," *see* Tex. Occ. Code § 2301.467(a)(1), we have previously concluded that a distributor's calling for its dealers to meet standards for eligibility in incentive programs suffices as requiring adherence, *see Jaguar Land Rover N. Am.*, 2017 WL 6756997, at *8. So although Volvo relies heavily on the observation that dealers could choose to pursue CSI or SSI bonuses or not, that circumstance alone does not mean that the programs do not "require adherence." And in any event, the CSI and SSI surveys were designed to measure customer satisfaction in dealers' car-sales or car-servicing processes, and no one disputes that dealers must sell and service cars in their businesses. Further, evidence in the administrative record supported both the Board's decision that Volvo terminated Star's franchise

14

in part based on the low CSI and SSI scores, as discussed above, and its decision that Star had little choice but to pursue CSI and SSI bonuses. Star's owner testified that competing Volvo dealers use the expected bonus revenues as margins for lowering car prices for customers, with the effect that dealers like Star who are not receiving bonus revenues are hampered in competing for Volvo customers.

Finally, evidence in the record provided a reasonable basis for deciding that the CSI and SSI programs were unreasonable. The Board's findings about top-box scoring and Volvo's limiting the scoreable questions to only four out of a much longer survey were supported by testimony from Star's expert. He opined that the survey results do not reliably measure customer satisfaction and cannot reveal anything more than merely the customers' responses to specific questions. Beyond this reliability problem, the expert identified two further unsound assumptions made by Volvo when it tied the CSI and SSI survey results to per-vehicle payments made to its dealers: that differences in survey-score results equate to differences in customers' happiness with their dealerships and that differing amounts of bonus payments represent material differences in happiness attributable to the dealerships' actions. Volvo's expert even added to this when he contrasted "sales effectiveness"[7] with CSI and SSI surveys, referring to the former as "the ultimate measure of customer satisfaction." The statistical concepts of "sampling error" and "nonresponse bias" were two of the problems undermining Volvo's assumptions for using the surveys, according

---

[7] Volvo's senior manager explained that "sales effectiveness" measures a particular Volvo retailer's number of sales in a given "segment" (for example, "premium cars" is a segment) against the average Volvo retailer's number of such sales. If the average Volvo retailer sells five percent of the cars in a particular segment, then a sales-ineffective retailer sells less than five percent in the segment.

to Star's expert, especially when it came to the top-box scoring. In deposition testimony admitted into evidence, the expert gave these clarifying remarks:

> Q. How would it be unfair to one dealer as opposed to another dealer that's—that's working under the same standard and process?
>
> A. It's not working under the same standard because—because there's an error rate—there's an error rate that's inherent in the process, and if—if there's a margin of error of three points, just hypothetically—I don't have the data to know what the margin of error is, but if it were three points and that margin of error was higher for low response rate dealers or smaller dealers—so a—a bigger dealer is within one and a half points, a smaller dealer is within four points, then even though they're— they're getting the same questions, they're under the same rules nominally, they're not under the same process. It's not the same variable and the error rate doesn't have the same implications or same exposure to risk and consequences.

Then in testimony during the hearing before the ALJs, the expert added that "outside of normal transactions" dealerships can distort their survey scores upwards through acts that are not themselves captured in the surveys. Finally from Star's expert, the surveys suffer from "scale compression"—no one really gives medium scores anymore, making any differences in scores less meaningful, with the result that treating average performers as unsatisfactory performers is unreasonable because using averages always necessitates that some dealers are below-average.

Volvo responds that the expert's testimony amounts to no evidence at all because the expert had not performed underlying statistical or quantitative analysis of Volvo's use of the survey results.[8] But this is a challenge to the expert's methodology disguised as a legal-sufficiency attack, *see In re Commitment of Delarosa*, No. 03-21-00541-CV, 2022 WL 3403347, at *2–3 (Tex.

---

[8] Volvo's authorities for its challenge to the expert's testimony are from the context of standard civil appeals of Texas trial-court judgments outside the administrative-law context. We apply those standards here as Volvo asks us to. *Cf.* Tex. Gov't Code § 2001.081 (applying to contested-case hearings "[t]he rules of evidence as applied in a nonjury civil case in a district court of this state").

App.—Austin Aug. 17, 2022, no pet.) (mem. op.) (explaining distinction between these two kinds of expert challenges and why certain of appellant's arguments constituted one kind instead of the other), and so is forfeited because Volvo did not raise it either before or when the testimony was offered. "When the expert's underlying methodology is challenged, the court 'necessarily looks beyond what the expert said' to evaluate the reliability of the expert's opinion." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020) (internal quotation omitted) (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)). Thus, "when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Id.* (internal quotation omitted) (quoting *Coastal Transp.*, 136 S.W.3d at 233). This means that "when an expert opinion 'is admitted in evidence without objection, it may be considered probative evidence even if the basis of the opinion is unreliable.'" *Id.* (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). On the other hand, a "party need not object in order to challenge . . . expert testimony as conclusory or speculative on its face; it need only preserve a challenge to the legal sufficiency of the evidence, which it may do post-verdict." *Id.* An expert's testimony "is conclusory as a matter of law if he 'simply state[s] a conclusion without any explanation'" and "is speculative if it is based on guesswork or conjecture." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (quoting *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008)). Star's expert gave his reasons for concluding that the CSI and SSI survey processes suffered from the flaws laid out above. His testimony thus was not conclusory or mere speculation.

In sum, there was substantial evidence for the Board to conclude that the CSI and SSI programs violate Occupations Code section 2301.467(a)(1).  We thus overrule Volvo's first issue.

**III.    Substantial evidence supported the Board's rulings that Volvo's CSI and SSI programs violated Section 2301.468.**

In its second issue as cross-appellant, Volvo maintains that the Board erred by concluding that the CSI and SSI programs violate Occupations Code section 2301.468.  That statute says that a distributor may not

> treat franchised dealers of the same line-make differently as a result of the application of a formula or other computation or process intended to gauge the performance of a dealership or otherwise enforce standards or guidelines applicable to its franchised dealers in the sale of motor vehicles if, in the application of the standards or guidelines, the franchised dealers are treated unfairly or inequitably in the sale of a motor vehicle owned by the manufacturer or distributor.

Tex. Occ. Code § 2301.468.[9]  As part of this issue, Volvo challenges the findings of fact that the Board adopted to support its conclusion that the CSI and SSI programs violate the statute, including the three findings that the "CSI/SSI bonus programs are a computation or process intended to gauge the performance of a dealership," that "[l]ower-volume dealers are at an inherent disadvantage in the survey process," and that the "use of only four questions and the top-box scoring of those questions is likely to discriminate against dealers on the basis of volume of sales."

---

[9] Although it is not a foregone conclusion that the current, 2011 version of the statute applies here because Star and Volvo entered into their franchise agreement decades ago, Star, Volvo, and the Board all agree that the current version applies.  *See Paxton v. Longoria*, 646 S.W.3d 532, 538 (Tex. 2022) (parties' agreement on legal issue destroys necessary adversity predicate for appellate court to decide same issue).  The earlier, 2003 version of the statute has been continued for many purposes.  *See* Act of May 10, 2011, 82d Leg., R.S., ch. 137, §§ 16–17, 2011 Tex. Gen. Laws 643, 649.

Volvo's arguments accept that the CSI and SSI programs are computations or processes intended to gauge Star's performance, and Volvo argues instead that the programs were not unfair, inequitable, or discriminatory in their treatment of Star. We disagree, both for the reasons we articulated above for why there was a reasonable basis for the Board to conclude that the programs were unreasonable under Section 2301.467(a)(1) and because testimony established that Star is a low-volume seller. For example, Volvo's market manager distinguished Star from the other Houston-area Volvo dealers, who "sell a tremendously higher volume of cars." And Star's service manager linked Star's low sales volume with its difficulties in survey responses, testifying, "being a small volume store, you know, if I get six, ten reports—or excuse me, customer replies back and I get one bad survey, it's sunk," in which case "there's no way to catch up."[10] Even Volvo's expert backed this up when he testified that a small number of surveys for Star could lead to large swings in its CSI and SSI scores. This testimony plus the expert testimony detailed above gave the Board a reasonable basis to conclude that the CSI and SSI programs were unfair, inequitable, or discriminatory to Star. We thus overrule Volvo's second issue.

**STAR'S APPELLATE ISSUES**

In its second and third issues, Star maintains that each of the six Dealer Incentive Programs violate each of six different statutory provisions within Occupations Code chapter 2301. We first dispense with Star's claims under each statutory provision involving the Factory

---

[10] Volvo argues that the service manager's testimony on this topic was conclusory or speculative, but he provided reasons for the Board to believe his testimony, including that he had worked as Star's service manager for over ten years and that he reports directly to Star's owner and has discussed Star's CSI or SSI results with the owner many times. The PFD quoted the service manager on these matters, suggesting that the ALJs considered his testimony to be credible, and the Board did not alter that assessment.

19

Options program. There was a reasonable basis in the evidence for the Board to have concluded that the program did not violate any statute that Star raised because Star's own expert testified that he "d[id]n't see much to [Star's] complaint on that—on that program." We turn next to the five remaining Dealer Incentive Programs and the statutory provisions that Star argues the programs violated.

### Section 2301.468

Star raises Occupations Code section 2301.468 for the three Dealer Incentive Programs beyond the CSI and SSI programs addressed above. The current version of that statute, applicable here as explained above, says that a distributor may not

> treat franchised dealers of the same line-make differently as a result of the application of a formula or other computation or process intended to gauge the performance of a dealership or otherwise enforce standards or guidelines applicable to its franchised dealers in the sale of motor vehicles if, in the application of the standards or guidelines, the franchised dealers are treated unfairly or inequitably in the sale of a motor vehicle owned by the manufacturer or distributor.

Tex. Occ. Code § 2301.468. To prove any claim under this statute, a claimant must prove "unfair[ness] or inequit[y]." *See id.* Thus, "treat[ing] franchised dealers of the same line-make differently as a result of the application of a formula or other computation or process intended to gauge the performance of a dealership" will be unlawful under the statute only if the different treatment is "unfair[] or inequitabl[e]."[11]

---

[11] The ALJs agreed with this interpretation. In a statement in the PFD's background section, and unaltered by the Board and unchallenged by the parties, the ALJs said that the statute "essentially prohibits manufacturers from treating franchised dealers unfairly or inequitably in the sale of motor vehicles."

For each of the challenged Dealer Incentive Programs, there was a reasonable basis in the record for the Board to have concluded that the program is not unfair or inequitable. Globally for all the Dealer Incentive Programs, Star complains that they resulted in other dealers' unfairly taking sales from Star. The argument goes that other dealers would receive a bonus as a credit toward, or proportion of, the wholesale price of a car the dealer bought from Volvo so the dealer could use those savings as trading margin to offer lower retail prices to customers, thereby unfairly taking sales from Star. There was a reasonable basis in the record for the Board to have rejected this line of argument for all the Dealer Incentive Programs. Volvo's expert testified that he had analyzed Star's sales performance, what caused it, and the Dealer Incentive Programs. He opined that Star's poor sales record predated any of the Dealer Incentive Programs, meaning that they would have had to have uniquely harmed Star compared to all other Volvo dealers to cause the years-long poor sales performance Star exhibited. But no evidence suggested that the programs were designed uniquely to harm Star; the evidence instead suggested that the thresholds for dealers to benefit from the programs applied equally across Volvo's dealer community.

For each specific Dealer Incentive Program, there was still more evidence in the record providing a reasonable basis for the Board to have rejected Star's position under Section 2301.468 that each program was unfair or inequitable. Specifically regarding the FISI program, the amounts Volvo paid to participating dealers were, according to the evidence, capped at 50 percent (or sometimes less) of the amount the dealer invested in improving its facilities. This meant that FISI never reimbursed any dealer for the whole cost of its facilities-improvement efforts. Star complains that the FISI payments should be viewed only on a per-wholesale-car basis,

21

but if the FISI payments must be viewed this way,[12] then so should the facility-investment dollars that brought them about, as Volvo's expert testified and explained in his expert report, which was admitted into evidence. And because the amounts paid in facility investment would always be greater than the FISI payments, that means that when viewed on a per-car basis, FISI-recipient dealers were taking a risk that their improved facilities would not lead to increased sales volume, resulting in per-car losses when the facility investments are considered alongside the FISI amounts. This is not unfair or inequitable treatment to Star, who usually did not take the same risks.

For the Volvo 360 program, Star when not benefitting from the program was again not taking risks that dealers receiving the bonuses were taking. The program incentivized dealers to purchase and certify cars whose customer leases were ending and then re-sell them. Dealers receiving these bonuses thus were expending costs, time, and effort buying the cars, inspecting them, marketing them, and selling them, all in the hopes that those risks would lead to more sales. So when Star was choosing not to take those risks, it was not being treated unfairly or inequitably by not receiving the program's rewards. Volvo's expert also testified that dealers in high-lease-rate areas did not have an advantage in achieving the program's bonuses over dealers in lower lease-rate areas.

Finally, for the Retailer Standards program, the evidence showed two phases to the program—one before 2019, which incentivized dealers to follow Volvo-preferred business practices in areas like preparing and submitting financial statements and training personnel, and

---

[12] There was evidence that the Dealer Incentive Program bonuses should not be viewed in this way. Volvo's senior manager testified that bonuses are only paid twice a year, as opposed to each time a dealer buys a car wholesale from Volvo. The senior manager went on to testify, referring to financial statements that Volvo required Star to prepare and submit, that Star accounted for bonuses it received on a line item separate from "costs of goods sold."

the other from 2019 onward, which added an image-compliant-facility component. Concerning the program before the facility component, both Volvo's senior manager and Star's expert similarly testified that the costs to comply with the program were not high, and the evidence further showed that Star indeed benefitted from the program. And concerning the program after the facility component was introduced, nothing in the evidence differentiated the program in terms of unfairness and inequity from the FISI program addressed above—neither program would fully compensate the risk-taking dealer for updating its facilities. In all, there was a reasonable basis in the record for the Board to reject Star's challenges under Section 2301.468 to each of these programs.

*Section 2301.467(a)(1)–(2)*

Star next raises Occupations Code section 2301.467(a), under which a distributor may not (1) "require adherence to unreasonable sales or service standards" or (2) "unreasonably require a franchised dealer to purchase special tools or equipment." Tex. Occ. Code § 2301.467(a)(1)–(2). Star's first argument applies equally to all the challenged Dealer Incentive Programs. It argues that because the programs were never made part of the terms of Star's franchise agreement with Volvo, the programs were unreasonable for the sole reason that they were extra-contractual. But Star points us to no authorities, and we are aware of none, to support that argument, and nothing in the plain language of Section 2301.467(a) supports that argument, which would have been simple enough a concept for the Legislature to add to the statute, which it has not done.[13] We thus reject the argument.

---

[13] Section 2301.467(a)'s text shows that the Legislature took into consideration the distinction between distributors' statutory duties to their dealers as against their duties arising from

Star goes on to argue from the language of the statute about each of the Dealer Incentive Programs, but we conclude that there were reasonable bases in the evidence for the Board to have rejected Star's claim that each program violated the statute. There was evidence that FISI was not an *unreasonable* standard and made no *unreasonable* requirements of dealers, *see* Tex. Occ. Code § 2301.467(a)(1)–(2), for the reasons we explained above for why the evidence supported concluding that FISI was not unfair or inequitable. Plus, under the definitions we adopted in *Jaguar Land Rover North America*, 2017 WL 6756997, at *8, there was a reasonable basis for concluding that FISI was not a sales or service standard, *see* Tex. Occ. Code § 2301.467(a)(1). Unlike CSI and SSI, each of which tested Star's customers' satisfaction when the customers either bought cars or car service from Star, FISI rewarded dealers for spending money to improve their facilities—not for selling cars or services to customers.

For both Volvo 360 and Retailer Standards, just as we concluded above that there was a reasonable basis in the record for the Board to have concluded that the two programs were not unfair or inequitable, we similarly conclude that there was a reasonable basis for the Board to have concluded that the programs were not *unreasonable* standards, *see id.*, and did not *unreasonably* require purchases of special equipment or tools, *see id.* § 2301.467(a)(2).

For CSI and SSI, we upheld above the Board's conclusions that those two programs violated Section 2301.467(a)(1), and we also uphold the Board's conclusions that those two programs did not violate Section 2301.467(a)(2). The evidence about the programs allowed the Board reasonably to conclude that they did not unreasonably require dealers to purchase special

their franchise agreements. The statute says that "[n]otwithstanding the terms of any franchise," distributors may not take the actions the statute prohibits. *See* Tex. Occ. Code § 2301.467(a). The statute easily could also have said—but does not say—that the actions are prohibited when they are not within the "terms of any franchise."

24

equipment or tools. The programs worked by tabulating customer-survey results and comparing those results to numerical standards; in no instance, according to the evidence, did the programs require Star to buy anything.

*Section 2301.476(c)(2)*

Star also challenges the Dealer Incentive Programs as violating the statutory prohibition on distributors' directly or indirectly operating or controlling a franchised or nonfranchised dealership. *See* Act of May 25, 2011, 82d Leg., R.S., ch. 1290, § 16, sec. 2301.476(c)(2), 2011 Tex. Gen. Laws 3597, 3601 (amended 2019).[14] Star focuses on the statute's concept of "control," and no Texas appellate opinion has interpreted "control" for these purposes.

When interpreting the plain meaning of a term not defined by a statute, we must not give the term "a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone." *See Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). "In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole." *Id.* "Statutory terms should be interpreted consistently in every part of an act." *Id.*

Section 2301.476 specifies what it means for an entity to be controlled but only for purposes of a subsection of the statute different from the one at issue here: "For purposes of Subsection (a)(1)(B)(ii), a person is controlled by a manufacturer if the manufacturer is directly

---

[14] This is the version of Section 2301.476(c) that was in effect when in 2016 Star began the administrative proceeding underlying this case. The parties' appellate briefs rely on this version of the statute and do not invoke the changes to Section 2301.476(c) that became effective in 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 440, §§ 1–2, sec. 2301.476(c), 2019 Tex. Gen. Laws 837, 837–38.

or indirectly authorized, by law or by agreement of the parties, to direct or influence the person's management and policies." Tex. Occ. Code § 2301.476(b). But because we are to interpret the statute's notion of control consistently "in every part of [the] act," *see Needham*, 82 S.W.3d at 318, we will apply this meaning of control for purposes of Section 2301.476(c)(2).

There was a reasonable basis in the evidence for the Board to have concluded that the Dealer Incentive Programs did not result in Volvo's directing or influencing Star's management and policies. Evidence showed that for much of the 40-plus years of the Star–Volvo relationship, Star refused to operate its business in the ways the Dealer Incentive Programs incentivized, suggesting a lack of direction or influence by Volvo. Star's owner suggested that he has resisted for years Volvo's moves to have Star plan out its revenue and sales goals more concretely and testified that though Volvo informed him of what it wanted in CSI, SSI, and facilities investments, he never agreed to those. Star's owner also confirmed that when Volvo presented Star with improvement plans because its survey scores were low, Star never had to participate in the plans and to the extent it complied, only did so to "[go] along to get along." Star's owner rejected Volvo's position that Star had any obligation to achieve certain sales-performance benchmarks, and Star's service manager testified in the context of Star's continually low service scores that Star is "a small shop" and was not given guidance by Volvo about how to approach customers to improve the survey scores. Indeed, the Board found, and no party disputes the findings, that (1) despite listening politely to Volvo personnel when they meet with him to discuss ways to improve Star's sales performance, Star's owner "ignores Volvo's advice or outright states that he is unwilling to make the requested changes" and (2) "[f]or years, [Star's owner] has told Volvo that he has no interest in upgrading Star's facilities or participating in any incentive programs that would have rewarded Star for meeting modern facilities standards."

26

For Volvo's part, Volvo's market manager testified that Star has consistently been a low-performing, and even the lowest-performing, dealer in its Volvo region[15] for many years despite its immediate area's enjoying the highest market potential in Houston. Even in the face of this low performance, the Dealer Incentive Programs, evidence showed, did not bring Star into line with the acts and practices that the programs incentivized—Star kept refusing Volvo's wishes. In all then, there was a reasonable basis in the evidence for the Board to have concluded that the Dealer Incentive Programs did not result in Volvo's directing or influencing Star's management and policies. *See* Tex. Occ. Code § 2301.476(b), (c)(2).

### Section 2301.451

Star maintains that the Dealer Incentive Programs amounted to Volvo's "requir[ing] or attempt[ing] to require a franchised dealer to order, accept delivery of, or pay anything of value, directly or indirectly, for a motor vehicle or an appliance, part, accessory, or any other commodity" without "the dealer['s] voluntarily order[ing] or contract[ing] for the item," in violation of Occupations Code section 2301.451. On appeal, Star limits its arguments under this statute to the Volvo 360 program. And there was a reasonable basis in the evidence for the Board to have concluded that Volvo 360 required no car acquisitions by dealers without their voluntarily ordering the cars. Volvo 360 used an auction process for dealers to buy the cars whose leases were ending. Thus, no dealer was required to take a car without having already placed a bid for it, suggesting that they were voluntarily seeking to acquire the cars under the program.

---

[15] The Board found, and no one disputes, that: Star is in the Volvo region covering thirteen states from Maryland to Florida to Texas; "Star is the lowest-selling dealer in Houston despite having the largest market opportunity"; and "[s]ince at least 2012, there is no measure by which Star's sales have come close to matching the performance of other Volvo dealers in the Houston, regional, or national markets."

*Section 2301.473(2)(C)*

Star complains that the FISI program violated Occupations Code section 2301.473(2)(C) because it "require[d] as a prerequisite to receiving a model or series of vehicles that a franchised dealer . . . remodel, renovate, or recondition the dealer's existing facilities." As with its other statutory claims, Star bore the burden of proof on this claim, which it raised as a counterclaim in the administrative proceeding. *See* 1 Tex. Admin. Code § 155.427 (2022) (State Off. of Admin. Hearings, Burden of Proof) (how ALJs are to assign burden of proof). The ALJs, citing Administrative Code title 1, section 155.427 said that Star bore the burden of proof on its counterclaims, and Star does not dispute that it bore the burden.

We conclude that there was a reasonable basis in the record for the Board to have ruled against Star on this claim because Star did not carry its burden on the claim. The Board made the following three rulings, saying that Star did not explain the factual basis for this statutory claim, which centered on an "allocation override":

215. The current version of FISI includes an "allocation override" of 35 percent for Site Exclusive and 20 percent for Customer-Facing Exclusive Facilities.

216. Neither the meaning of the FISI allocation override or its practical implication for dealers was explained by the evidence.

217. The allocation override aspect of FISI does not, on its face, require any facility changes in order for a dealer to receive a certain model or series of vehicles.

Star's arguments on appeal do not undermine these rulings. The evidence Star cites as support does not reveal the meaning or implication of the FISI allocation override, which Star argues is the mechanism by which Volvo violated Occupations Code section 2301.473(2)(C). Star first cites an exhibit admitted into the administrative proceeding's evidentiary record that shows an

28

"allocation override" of 35% for "Site Exclusive" and 20% for "Customer Facing Exclusive," which matches the Board's rulings. Then it cites its owner's testimony explaining that FISI disadvantaged Star because FISI-compliant dealers "would get preferential allocations of the best selling cars that were available" and though Star would "have deposits on cars," it "couldn't get [them] because the dealer with the new facility got a certain number of those cars."

This evidence—which is all that is cited in Star's appellant's brief's arguments under this claim—does not show that the Board had no reasonable basis in the record to make the rulings it made suggesting that Star failed to carry its burden by failing to explain what "allocation override" meant or how it operated unlawfully under the statute. The agency is the sole judge of the weight of the evidence and credibility of the witnesses. *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 179 S.W.3d 589, 601 (Tex. App.—Austin 2005, pet. denied). Plus, the Motor Vehicle Board is the expert in this area, and we will not undermine its rulings on this claim without more. *Cf. Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 18 (Tex. 2000) (identifying benefits of agency adjudication of claims within agency's sphere like "ensuring that administrative agencies decide, at least initially, questions that require 'the special knowledge, experience and services of the administrative tribunal to determine technical and intricate matters of fact'" and "uniformity of ruling[s] . . . to comply with the purposes of the regulatory statute administered" (quoting and citing *Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W.2d 753, 755 (Tex. App.—Waco 1950, writ ref'd))); *State v. Public Util. Comm'n*, 883 S.W.2d 190, 197 (Tex. 1994) ("When an administrative agency is created to centralize expertise in a certain regulatory area, it is to be given a large degree of latitude in the methods it uses to accomplish its regulatory function."); *accord Mid–Century Ins. Co. v. Texas Workers' Comp. Comm'n*, 187 S.W.3d 754, 757 (Tex. App.—

Austin 2006, no pet.), *(citing Texas Mun. Power Agency v. Public Util. Comm'n*, 150 S.W.3d 579, 586 (Tex. App.—Austin 2004), *rev'd in part on other grounds*, 253 S.W.3d 184 (Tex. 2007)).

### Section 2301.478(b)

Star's final counterclaim was that Volvo violated its "duty of good faith and fair dealing" via each Dealer Incentive Program. *See* Tex. Occ. Code § 2301.478(b). "Determining whether a party acts in good faith entails an equitable evaluation of the behaviors in question." *Buddy Gregg Motor Homes*, 179 S.W.3d at 611. "Generally, a party does not act in bad faith if its actions are permitted under the contract." *Id.* at 615. In a party's dealings with its franchise counterparty, the party's departure from "its usual practice" can supply evidence of a breach of the duty of good faith and fair dealing. *See id.* at 617.

The linchpin of Star's arguments under Section 2301.478(b) is its position about how Volvo pays out bonuses to dealers complying with one or more of the Dealer Incentive Programs. Star argues that Volvo, "instead of just paying dealers a lump sum payment, untied to the sale of a vehicle, . . . is specifically paying bonuses" as "a percentage discount off the wholesale price," which is "competitively harm[ing] non-participating dealers." But there was a reasonable basis in the evidence for the Board to reject this position. As stated above, Volvo's senior manager testified that bonuses are only paid twice a year, as opposed to each time a dealer buys a car wholesale from Volvo. The senior manager also testified, referring to financial statements that Volvo required Star to prepare and submit, that Star accounted for bonuses it received on a line item separate from "costs of goods sold." This evidence reasonably allowed the Board to reject the explanation on which Star's Section 2301.478(b) arguments hinge.

30

*Conclusion Under Star's Appellate Issues*

We overrule Star's second and third appellate issues. Because of our resolutions of Star's and Volvo's appellate issues, we need not reach Star's first issue, which concerns whether each Dealer Incentive Program was voluntary for Volvo's dealers. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the Motor Vehicle Board's Final Order.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly
  Concurring Opinion by Justice Triana

Affirmed

Filed:  May 25, 2023